**No. 23-35544**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,

*Plaintiff-Appellee*,

*v.*

U.S. DEPARTMENT OF THE INTERIOR, ET AL.,

*Defendants*,

J.R. SIMPLOT COMPANY,

*Defendant-Intervenor-Appellant.*

On Appeal From The United States District Court
For The District Of Idaho
No. 4:20-cv-553 (Hon. B. Lynn Winmill)

## DEFENDANT-INTERVENOR-APPELLANT'S PETITION FOR PANEL REHEARING AND REHEARING EN BANC

Thomas C. Perry
J.R. SIMPLOT COMPANY
1099 West Front Street
Boise, Idaho  83707

Stephen J. Odell
MARTEN LAW, LLP
1050 S.W. Sixth Avenue, #2150
Portland, Oregon  97204

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2011
Dallas, TX  75201

Miguel A. Estrada
  *Counsel of Record*
Jonathan C. Bond
Lavi M. Ben Dor
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
MEstrada@gibsondunn.com

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071

*Counsel for Defendant-Intervenor-Appellant J.R. Simplot Company*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 40 STATEMENT .................................. 1

BACKGROUND ................................................................. 3

REASONS FOR GRANTING THE PETITION .................................... 10

    I.     The Panel Decision Eviscerates FLPMA And Contravenes Supreme Court Precedent By Reading An Earlier Statute To Negate FLPMA's Later, Express Grant Of Exchange Authority ....................... 10

    II.    The Panel Decision Creates A Conflict With The D.C. Circuit .................................................................. 18

    III.   Whether This Pre-FLPMA Statute Nullifies FLPMA's Express Grants Of Disposal Authority Is Exceptionally Important ...................................... 19

CONCLUSION ................................................................. 22

CERTIFICATE OF COMPLIANCE ......................................... 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Best* v. *Humboldt Placer Mining Co.*,
371 U.S. 334 (1963)................................................................19

*Blackfeet Indian Tribe* v. *Montana Power Co.*,
838 F.2d 1055 (9th Cir. 1988)................................................13

*Connecticut National Bank* v. *Germain*,
503 U.S. 249 (1992)...............................................................11

*Dorsey* v. *United States*,
567 U.S. 260 (2012)................................................................15

*Epic Systems Corp.* v. *Lewis*,
584 U.S. 497 (2018).........................................................11, 14

*Fletcher* v. *Peck*,
10 U.S. (6 Cranch) 87 (1810) ................................................15

*Herrera* v. *Wyoming*,
587 U.S. 329 (2019).........................................................16, 17

*Lac du Flambeau Band of Lake Superior Chippewa
Indians* v. *Coughlin*,
599 U.S. 382 (2023)................................................................17

*Lujan* v. *National Wildlife Federation*,
497 U.S. 871 (1990).................................................................4

*Morton* v. *Mancari*,
417 U.S. 535 (1974)................................................................11

*National Coal Ass'n* v. *Hodel*,
825 F.2d 523 (D.C. Cir. 1987)........................................3, 18, 19

*Parker Drilling Management Services, Ltd.* v. *Newton*,
587 U.S. 601 (2019).................................................................4

*Pennsylvania Department of Corrections* v. *Yeskey*,
524 U.S. 206 (1998)..................................................17

*Reichelderfer* v. *Quinn*,
287 U.S. 315 (1932)..................................................15

*Rocky Mountain Oil & Gas Ass'n* v. *Watt*,
696 F.2d 734 (10th Cir. 1982).......................................3

**Statutes**

Act of June 6, 1900, ch. 813, § 1, 31 Stat. 675.......................6

Act of June 6, 1900, ch. 813, § 5, 31 Stat. 676...............1, 7, 12

Agreement of Feb. 5, 1898, Art. IV, 31 Stat. 674....................16

Mineral Leasing Act of 1920, ch. 86, § 37, 41 Stat. 451............18

Reclamation Act of 1902, ch. 1093, § 3, 32 Stat. 389
(43 U.S.C. § 432) ...................................................20

43 U.S.C. § 1702(e) ......................................4, 9, 10, 17

43 U.S.C. § 1702(e)(1).............................................4

43 U.S.C. § 1702(e)(2).............................................4

43 U.S.C. § 1713(a) ...............................................4

43 U.S.C. § 1716(a) .........................................4, 5, 10

43 U.S.C. § 1716(b) ...............................................5

43 U.S.C. § 1716(d)(1).............................................5

43 U.S.C. § 1716(h)(1).............................................5

**Regulations**

90 Fed. Reg. 50,494 (Nov. 7, 2025)................................5

**Rules**

Fed. R. App. P. 40 ............................................................................... 1

**Other Authorities**

S. Doc. No. 169, 55th Cong., 2d Sess. (1898) ............................................ 12

U.S. Geological Survey,
   *Mineral Commodity Summaries* (2024) ............................................. 21

## INTRODUCTION AND RULE 40 STATEMENT

Congress enacted the Federal Land Policy and Management Act of 1976 (FLPMA) to create a comprehensive legal framework for the federal government's management of federal lands. FLPMA grants the Executive broad power to use or dispose of all public lands—however acquired—in multiple ways, including by exchanging them for private lands. But over Judge Bumatay's dissent, a divided panel eviscerated FLPMA's express exchange authority based on an obscure 1900 statute that approved the acquisition of the lands at issue and separately authorized initial disposal methods. Act of June 6, 1900 (1900 Act), ch. 813, § 5, 31 Stat. 676. That decision reads that arcane enactment to nullify authority Congress later granted in FLPMA, would lock up a wide swath of public lands in Idaho, and may cause many similar, largely obsolete statutes to handcuff the Executive in managing *millions* of acres more— mostly in this Circuit.

The panel decision strikes at the heart of FLPMA's comprehensive scheme by defying its text and thwarting its central aim. As the majority acknowledged, "it is clear that if the 1900 Act did not exist, FLPMA would permit disposal of the" lands here. Op. 19. The majority nevertheless

1

held that the 1900 Act's provision of the original disposal methods—none of which remains available today—disabled any future Congress from authorizing additional methods without expressly repealing the 1900 Act or invoking that law or the affected lands by name.

The majority's conclusion flouts Supreme Court precedent at every step. Although the two statutes have coexisted comfortably for half a century, the majority reasoned that the 1900 Act and FLPMA conflict and that the former controls because FLPMA did not expressly repeal it or refer to the ceded lands by name. That contravenes the Supreme Court's teaching that courts must *reconcile* purportedly inconsistent statutes whenever possible, not *create* needless conflict. It also defies the Court's decisions making clear that one Congress cannot impose a Simon-says drafting rule on its successors. And the majority violated the Court's instructions twice over by applying an inapposite clear-statement rule for tribal-treaty rights and transforming that rule into a magic-words requirement.

The majority's result also conflicts with D.C. Circuit precedent. That court rejected as "implausible" the approach the majority embraced

of treating a pre-FLPMA grant of authority as defeating FLPMA. *National Coal Ass'n* v. *Hodel*, 825 F.2d 523, 527 (D.C. Cir. 1987) (per curiam).

The question is exceptionally important. The decision leaves the Executive with no "viable method for disposing of" public lands the 1900 Act covered—originally some 416,000 acres. Op. 44 (Bumatay, J., dissenting) (citation omitted). And the majority's reasoning means that dozens of similarly worded statutes now may disable the Executive from disposing of millions of acres of public land. The harms are acute in this case: Undoing the exchange would cut short by decades a fertilizer plant owned by appellant-intervenor J.R. Simplot Company, cost Idaho thousands of jobs and hundreds of millions of dollars in economic activity, and undermine the Nation's food security.

The Court should grant panel rehearing or rehearing en banc.

## BACKGROUND

1. The Executive once managed 450 million acres of federal lands under a patchwork of "some 3,000 public land laws." *Rocky Mountain Oil & Gas Ass'n* v. *Watt*, 696 F.2d 734, 737-738 & n.2 (10th Cir. 1982). Deeming that "chaotic" status quo intolerable, in 1964 Congress charged a commission with proposing ways to rationalize administration

of federal lands.  *Lujan* v. *National Wildlife Federation*, 497 U.S. 871, 876 (1990).  The result was FLPMA, which replaced the rabbit warren of parochial provisions dating to the Founding with one coherent, comprehensive scheme for managing and disposing of public lands.  *Id.* at 877.

FLPMA applies to all "public lands," defined broadly as "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, *without regard* to how the United States acquired ownership."  43 U.S.C. § 1702(e) (emphasis added).  That sweeping definition is subject to only two exceptions.  One excludes "lands located on the Outer Continental Shelf," *id.* § 1702(e)(1), which are governed exclusively by a special statutory scheme, see *Parker Drilling Management Services, Ltd.* v. *Newton*, 587 U.S. 601, 606-607 (2019).  The other carves out "lands held for the benefit of Indians, Aleuts, and Eskimos."  43 U.S.C. § 1702(e)(2).  All agree that neither exception applies here.  Op. 10 n.5.

FLPMA empowers the Bureau to divest public lands by "sale," 43 U.S.C. § 1713(a), or (relevant here) "by exchange," *id.* § 1716(a).  The Bureau may "dispos[e]" of any "tract of public land or interests therein" by an "exchange" for non-public land, so long as the agency finds that the

4

"public interest will be well served" by the exchange and the exchanged lands are of "equal value" (or subject to "equalization") based on an independent appraisal. *Id.* § 1716(a), (b), (d)(1), (h)(1).

2.      Since 1944, Simplot has owned and operated a plant near Pocatello, Idaho, that processes phosphate ore to produce high-quality fertilizer. 6-ER-1338. Phosphate is a federally designated critical mineral used for fertilizer, which is vitally important to agriculture and the Nation's food security. 9-ER-2217; 90 Fed. Reg. 50,494, 50,495-50,496 (Nov. 7, 2025). Phosphate cannot be produced synthetically; it must be mined and processed. See 5-ER-945. The plant, long a backbone of the local economy, sits on private lands owned by Simplot. 5-ER-1069; 5-ER-1087-1088.

An essential part of Simplot's fertilizer production is storage of phosphogypsum (or gypsum). 4-ER-730. Because of its mineral content, gypsum generally cannot be disposed of offsite; Simplot must store it nearby in a facility called a gypsum stack (or gypstack). 4-ER-730. Although Simplot has long-term phosphate-ore reserves that can support another 80 years of operation, Simplot's plant cannot continue operating without enough space to store gypsum. 1-ER-6. In 2020, Simplot projected that

its plant would reach storage capacity by 2031 and would be forced to end or curtail production significantly, eliminating thousands of high-paying jobs. 1-ER-6.

3.     To avert that outcome, Simplot proposed in 1994 to acquire a parcel of land adjacent to its plant, owned by the federal government, in exchange for other nearby land that the federal government selected. 1-ER-7. The exchange will allow Simplot to extend its gypstack and keep the plant running into the 2080s. Gov't 3-ER-405.

The Shoshone-Bannock Tribes sued to stop the exchange. From 1868 to 1900, the land had been part of their Fort Hall Reservation. Op. 7. But they agreed to sell to the government a portion of the reservation, including the exchanged parcel, in an 1898 agreement that Congress approved in the 1900 Act, § 1, 31 Stat. 675. The Tribes had not owned that land for more than a century when they filed suit. They nevertheless asserted that the Bureau's environmental analysis of the exchange was insufficient. The district court agreed. Op. 9 n.3.

4.     After the Bureau produced a comprehensive environmental analysis and re-approved the exchange in 2020, the Tribes sued again. They argued for the first time that a provision of the 1900 Act disabled

the Bureau from relying on FLPMA's generally applicable disposal authorities. They pointed to language in the Act authorizing "disposal" of the ceded lands "under the homestead, townsite, stone and timber, and mining laws of the United States only." § 5, 31 Stat. 676. Those initial methods were neither negotiated by the Tribes nor part of the 1898 agreement. They were housekeeping provisions enabling the Executive to open up for settlement and other uses the lands it had just acquired. The Tribes nevertheless argued that the word "only" nullified FLPMA's later grant of exchange authority because FLPMA neither referred to the ceded lands by name nor expressly repealed the 1900 Act.

The district court granted summary judgment to the Tribes in relevant part. It held that the word "only" in Section 5 of the 1900 Act preserved the methods listed in that provision as the "exclusive means of lawful disposal." 1-ER-12-13. The court recognized that "Congress has repealed nearly all the homestead, townsite, stone and timber, and mining laws," and that its interpretation means that "the federal government does not currently have a viable method for disposing of the ceded lands" today. 1-ER-13. (The court also found defects in other aspects of the Bureau's approval of the exchange not relevant to this petition. 1-ER-18-36.)

5. A divided panel of this Court affirmed. Op. 6-36.

a. The majority relied solely on the ground that the 1900 Act prevented the Bureau from approving the exchange under FLPMA. Op. 12-36. The majority acknowledged that, "if the 1900 Act did not exist," "FLPMA would permit disposal of the ceded Fort Hall lands." Op. 19. But it reasoned that the word "only" in Section 5 of the 1900 Act made the methods that provision authorized the *exclusive* ways to dispose of the ceded lands. Op. 12-13.

The majority recognized that Congress had authorized various other disposal methods in the decades following 1900, but it stated that Congress could "properly add to Section 5's disposal options" only by "specifically refer[ring] to the ceded Fort Hall lands." Op. 21. Because "FLPMA did not *reference* the 1900 Act or *name* the ceded Fort Hall lands," the majority held, the Bureau could not invoke its exchange authority under FLPMA. Op. 22 (emphases added). The majority stated that applying FLPMA as an independent disposal method would "functionally repeal" the word "only" in the 1900 Act. *Ibid.* (The majority did not address other purported defects the district court found in the Bureau's approval. Op. 36.)

8

b.    Judge Bumatay dissented.  Op. 37-69.  He explained that "FLPMA governs the land exchange" because FLPMA's definition of "public lands" in Section 1702(e) "governs *all* public lands no matter how the land came into the possession of the federal government—including cession from Indian tribes."  Op. 42.  Although Congress initially authorized disposal of the ceded lands through four methods in the 1900 Act, he observed, Congress remained "free to create new paths for disposal of public lands, including the ceded land."  Op. 45.  In 1900, it had given the "government the statutory equivalent of a Ford Model T," but then "in 1976, Congress bought" the Executive "a sleek Mustang" that it can drive even "while the Model T may still sit in the garage."  Op. 47.

Judge Bumatay also warned that the majority's interpretation "raise[s] significant constitutional questions."  Op. 48.  The majority, he explained, read the word "only" as though "the 1900 Congress barred the 1976 Congress from fully exercising its legislative power" absent an express reference to the 1900 Act or ceded lands.  *Ibid.*  But "one Congress cannot bind a later Congress."  Op. 48-49 (citation omitted).  (Judge Bumatay then explained why the district court's alternative grounds for invalidating the exchange were unsupported.  Op. 61-69.)

**REASONS FOR GRANTING THE PETITION**

**I.**   **The Panel Decision Eviscerates FLPMA And Contravenes Supreme Court Precedent By Reading An Earlier Statute To Negate FLPMA's Later, Express Grant Of Exchange Authority**

Congress enacted FLPMA to "order the chaos" created by the "unwieldy patchwork of laws" that had long "governed the management of public lands." Op. 37 (Bumatay, J., dissenting). To that end, FLPMA unambiguously authorizes the Bureau to exchange any "public land" for private land when the Bureau finds the exchange serves the "public interest." 43 U.S.C. § 1716(a). The Bureau made that finding here. 4-ER-590-608. And the exchanged land here is indisputably "public land," defined as "*any* land and interest in land owned by the United States within the several states and administered by [the Bureau], *without regard to how the United States acquired ownership*." *Id.* § 1702(e) (emphases added). The two narrow (and undisputedly irrelevant) exceptions to that definition—lands on the Outer Continental Shelf and lands currently held in trust for tribes—only underscore its breadth. Op. 42-43 (Bumatay, J., dissenting). As Judge Bumatay observed, "[i]t's that simple." Op. 38.

The majority conceded that "it is clear that if the 1900 Act did not exist, FLPMA would permit disposal of the ceded Fort Hall lands." Op. 19.

But the majority deemed FLPMA inapplicable on the theory that it conflicts with, but does not specifically and clearly repeal, the 1900 Act. Each step of its reasoning contravenes Supreme Court precedent.

A. The whole premise of the majority's statutory analysis is that FLPMA and the 1900 Act conflict, so one must override the other. But the Supreme Court has made clear that "courts are not at liberty to pick and choose among congressional enactments"; rather, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard *each* as effective." Op. 45 (Bumatay, J., dissenting) (quoting *Morton* v. *Mancari*, 417 U.S. 535, 551 (1974)) (emphasis added); see, *e.g.*, *Connecticut National Bank* v. *Germain*, 503 U.S. 249, 253 (1992). "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention'" to do so. *Epic Systems Corp.* v. *Lewis*, 584 U.S. 497, 510 (2018) (citation omitted).

Instead of holding the Tribes to their burden, the majority manufactured a conflict between the 1900 Act and FLPMA where none exists. The 1900 Act authorized an initial set of methods for disposal of ceded

11

lands: "homestead, townsite, stone and timber, and mining laws of the United States only." § 5, 31 Stat. 676. But what methods were available to the Executive to dispose of the ceded lands *in 1900* is of no moment: Neither the 1900 Act's listing of those original methods nor the word "only" ever limited the Executive's ability to wield disposal authority that Congress could and did *later add* to the Executive's arsenal. A statute that authorizes "disposal methods A, B, and C only" for certain lands does not preclude future legislation authorizing "method D." Read "harmoniously," each statute "grant[s] supplemental, but independent, authorities to dispose of the public lands." Op. 47 (Bumatay, J., dissenting).

Section 5's language authorizing the initial methods was neither designed nor ever understood to tie future Congresses' hands. In the 1898 agreement, the Tribes did not bargain for any particular set of disposal methods. They ceded the lands "outright," leaving "to Congress and the Department [of the Interior] to dispose of the same in such manner as may be determined." S. Doc. No. 169, 55th Cong., 2d Sess. 11 (1898). Congress simply ensured the Executive could open up those just-acquired lands by authorizing most of the then-prevailing methods. It had no reason to freeze those disposal methods in perpetuity—much less leave the

Executive impotent to dispose of the ceded lands at all if those methods vanished.

Congress itself recognized that it could augment those methods by legislation, doing so repeatedly in the decades after 1900. Op. 46 (Bumatay, J., dissenting). One law adopted in 1926 applied *only* to the Fort Hall lands, confirming that Congress never perceived a conflict between the 1900 Act and later statutes conferring new authority. *Ibid.*

The majority's premise that the 1900 Act and FLPMA conflict, and that the 1900 Act controls unless formally repealed by FLPMA, Op. 19, 22, thus lacks any foundation. "Congress didn't need to expressly repeal the 1900 Act" because there is "no 'clear repugnancy'" between it and FLPMA. Op. 53 (Bumatay, J., dissenting) (citation omitted). Rather than *subtraction* through implied repeal, Congress in FLPMA engaged in *addition*, granting the Executive complementary authority to dispose of the lands by means beyond those the 1900 Act originally authorized. That is precisely how this Court—until now—has understood such overlapping statutory authorizations. Op. 58-60 (citing *Blackfeet Indian Tribe* v. *Montana Power Co.*, 838 F.2d 1055, 1056-1059 (9th Cir. 1988)).

Moreover, none of the disposal methods the 1900 Act initially permitted remains available today; all have been repealed or suspended by statute. Simplot Br. 46-47. Overreading the 1900 Act to forbid reliance on methods added later would mean, as the district court admitted, that "the federal government does not currently have a viable method for disposing of the ceded lands." Op. 53 (Bumatay, J., dissenting) (quoting 1-ER-13). In effect, the majority created a "third exception" for the ceded lands from FLPMA's comprehensive definition of "public lands." Op. 44. "[H]armoniz[ing]" FLPMA and the 1900 Act, *Epic*, 584 U.S. at 510, avoids that inexplicable outcome and gives effect to both laws.

B.     Even on its own terms, the majority's interpretation of the 1900 Act is irreconcilable with Supreme Court precedent. It misread the single word "only" to make the listed disposal methods exclusive unless and until a later statute either repealed Section 5 or "modifi[ed]" it by "clearly and expressly adding disposal options"—which the majority held Congress could do only by "referenc[ing] the 1900 Act or nam[ing] the ceded Fort Hall lands." Op. 21-22.

Nothing in the 1900 Act's text supports that invented express-cross-reference rule. And it would be ineffectual in any event because the

"plain import" of a "later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" *Dorsey* v. *United States*, 567 U.S. 260, 274 (2012) (citation omitted). Courts do not give effect to magic-words mandates in earlier statutes "because statutes enacted by one Congress *cannot* bind a later Congress." *Ibid.* (citing *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 135 (1810)) (emphasis added); see *Reichelderfer* v. *Quinn*, 287 U.S. 315, 317-318 (1932) (statute that "'perpetually dedicated'" public land for use as a park "expressed no more than the will of a particular Congress which does not impose itself upon those to follow in succeeding years" (citation omitted)). The majority's effort to read an express-reference requirement into the 1900 Act contravenes Supreme Court precedent and "raise[s] significant constitutional questions." Op. 48 (Bumatay, J., dissenting).

The majority fundamentally misunderstood these principles. It stated that "clear statement *canons*" do not involve "one Congress binding a later Congress." Op. 35-36 (emphasis added). But the majority read the 1900 Act *itself* to foreclose future statutes (including FLPMA) from conferring additional disposal authority unless they "specifically refer" to

15

that Act or the Fort Hall lands. Op. 21. Even if the 1900 Act had imposed such a rule, it would have no effect under binding precedent.

C. The majority ultimately retreated to the clear-statement rule for abrogating tribal-treaty rights. Op. 30-33. But under binding precedent, that rule has no application here—and would be overcome anyway.

The clear-statement rule "*only* applies to abrogation of 'Indian treaty rights.'" Op. 57 (Bumatay, J., dissenting). FLPMA did not abrogate the Tribes' off-reservation treaty rights. The 1898 cession agreement granted them rights to hunt, cut timber, and pasture livestock on the ceded lands "*so long as* any of the [lands] remain part of the public domain." Art. IV, 31 Stat. 674 (emphasis added). The cession agreement and the 1900 Act's separate authorization of disposal methods presupposed that the lands *could* leave the public domain. That is all the exchange here did.

The majority read *Herrera* v. *Wyoming*, 587 U.S. 329 (2019), to mean that even "conditional" "usufructuary treaty rights" trigger the clear-statement rule, Op. 32-33, but *Herrera* held no such thing. It explained that "the crucial inquiry" is "whether Congress has expressly abrogated an Indian treaty right *or* whether a termination point identified

16

in the treaty itself has been satisfied." 587 U.S. at 341 (emphasis added). The Court put no thumb on the scale in concluding that none of the treaty's "terminat[ing]" events had occurred. *Id.* at 345-346. Here, the 1898 cession agreement's no-longer-part-of-the-public-domain condition is plainly met.

Even if a clear statement were required, FLPMA supplies it. It defines "public lands" "without regard to how the United States acquired ownership." 43 U.S.C. § 1702(e). FLPMA says in so many words that whether land was acquired by purchase, foreign wars, or tribal cession *does not matter*. That text exudes "breadth," not "ambiguity." *Pennsylvania Department of Corrections* v. *Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted). Whether FLPMA name-checked these lands is irrelevant: "[T]he clear-statement rule is not a magic-words requirement." *Lac du Flambeau Band of Lake Superior Chippewa Indians* v. *Coughlin*, 599 U.S. 382, 394 (2023). In any event, "FLPMA *does* specifically address the ceded Fort Hall lands": It expressly repealed the 1926 statute noted above that applied *only* to those lands, confirming that Congress fully intended *FLPMA* to apply. Op. 50-51, 53 (Bumatay, J., dissenting).

## II. The Panel Decision Creates A Conflict With The D.C. Circuit

The result the panel majority reached conflicts with the D.C. Circuit's decision in *National Coal Association* v. *Hodel*, 825 F.2d 523 (D.C. Cir. 1987) (per curiam), which rejected the same blast-from-the-past theory that a pre-FLPMA law nullified FLPMA's land-exchange authority.

In *National Coal*, opponents of a land exchange under FLPMA argued that it violated the Mineral Leasing Act of 1920, which had authorized the disposal of coal deposits in public lands "only in the form and manner provided in [that] Act." Ch. 86, § 37, 41 Stat. 451. The court rejected that argument, finding no "contradiction" between the earlier statute and FLPMA. 825 F.2d at 527. Congress had simply "erected two schemes for disposition of federal coal interests," each with its own "restrictions." *Ibid.* Although Congress (after FLPMA) had amended the Mineral Leasing Act to state expressly that it did not override FLPMA, the D.C. Circuit explained that was unnecessary: The exchange opponents' "argument would be implausible even in the absence of" the amendment. *Ibid.*

*National Coal* makes clear that the D.C. Circuit would reject as incorrect—indeed, "implausible"—the panel majority's holding that the pre-FLPMA 1900 Act overrides FLPMA.  825 F.2d at 527.  That conflict with another circuit's binding precedent further warrants rehearing.

## III. Whether This Pre-FLPMA Statute Nullifies FLPMA's Express Grants Of Disposal Authority Is Exceptionally Important

If allowed to stand, the panel's holding that the 1900 Act bars the Bureau from exercising its land-disposal authority under FLPMA will be deeply destabilizing and wreak havoc on the Executive's management of public lands.

A.    As Judge Bumatay and even the district court recognized, the majority's interpretation leaves the United States without any "viable method for disposing of the ceded lands."  Op. 44 (quoting 1-ER-13).  That cession alone encompassed 416,000 acres, 3-ER-413, and the large portion that remains in the public domain is now locked up indefinitely.  In defiance of Congress's and the Executive's judgment, the panel decision obstructs the United States' "plenary authority over the administration of public lands." *Best* v. *Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963).

Worse, the majority's decision risks creating chaos in federal land law under similarly worded laws regarding many other public lands. Numerous cession acts—many concerning lands within the Ninth Circuit—use parallel phrasing, including the word "only." The panel decision could call into question past sales and exchanges of land once subject to disposal under now-defunct statutes like the homestead laws and foreclose any means of disposing of millions of acres of public lands. Simplot Br. Add. 31-64. For example, the Reclamation Act of 1902 directed the Secretary of the Interior to withdraw massive amounts of arid lands from the public domain, reclaim them through irrigation, and restore them "subject to entry *only* under the provisions of the homestead laws." Ch. 1093, § 3, 32 Stat. 389 (43 U.S.C. § 432) (emphasis added).

Although the majority purported to confine its "holding * * * to this particular exchange," Op. 34, that *ipse dixit* does nothing to limit its flawed reasoning, which extends to any exchange or sale of lands addressed by the 1900 Act and many other statutes. The majority's cryptic conjecture that "timber or mining" projects *might* somehow still be possible (*ibid.*) is foreclosed by its *holding* that the laws the 1900 Act listed—all made unavailable today by later legislation—are exclusive. Opponents of public-

20

land exchanges and sales will undoubtedly invoke this decision to weaponize many statutes, transforming dozens of largely obsolete land-disposal instructions into landmines that could blow holes in FLPMA's (formerly) comprehensive scheme.

B. The majority's decision also threatens the domestic economy and the national interest—as amici including Idaho, Utah, Nevada, the U.S. Chamber of Commerce, and the National Mining Association attested at the panel stage. The exchange would support about 3,763 jobs in the manufacturing sector, generating around $172.7 million in income and contributing approximately $768.3 million in industrial activity annually across the region. Op. 40 (Bumatay, J., dissenting). Together with Simplot's ore reserves, which could support another 80 years of operation, the exchange will enable Simplot to continue contributing substantially to the domestic fertilizer market into the 2080s.

Undoing the exchange would force Simplot to end or significantly curtail its plant's operations in just a few years. That loss would require the United States to rely more heavily on foreign states like China, and its allies Morocco and Russia, for this key crop input. U.S. Geological Survey, *Mineral Commodity Summaries* 134-135 (2024), tinyurl.com/9tvawxpe.

Increased reliance on imports will raise food prices for Americans and undermine national defense. By undercutting domestic phosphate production, the majority's decision could leave the United States at the mercy of foreign adversaries to grow food to feed the Nation during wartime.

## CONCLUSION

The Court should grant panel rehearing or rehearing en banc.

Dated: December 1, 2025

Respectfully submitted.

*/s/ Miguel A. Estrada*

| | |
|---|---|
| Thomas C. Perry<br>J.R. SIMPLOT COMPANY<br>1099 West Front Street<br>Boise, Idaho 83707 | Miguel A. Estrada<br>  *Counsel of Record*<br>Jonathan C. Bond<br>Lavi M. Ben Dor<br>GIBSON, DUNN & CRUTCHER LLP |
| Stephen J. Odell<br>MARTEN LAW, LLP<br>1050 S.W. Sixth Avenue, #2150<br>Portland, Oregon 97204 | 1700 M Street, N.W.<br>Washington, D.C. 20036<br>(202) 955-8500<br>MEstrada@gibsondunn.com |
| Stephen J. Hammer<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2011<br>Dallas, TX 75201 | Patrick J. Fuster<br>GIBSON, DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071 |

*Counsel for Defendant-Intervenor-Petitioner J.R. Simplot Company*

22

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## FORM 11
## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number** 23-35544

I am the attorney for Defendant-Intervenor-Appellant. I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing and rehearing en banc is prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains 4,195 words**, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

**Signature:** */s/ Miguel A. Estrada*

**Date:** December 1, 2025

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Nos.   23-35543<br>23-35544 |
| *Plaintiff-Appellee*, | D.C. No. 4:20-cv-00553-BLW |
| v. | |
| U.S. DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; LAURA DANIEL-DAVIS, Principal Deputy Assistant Secretary for Land and Minerals Management, | OPINION |
| *Defendants-Appellants*,<br>and | |
| J.R. SIMPLOT COMPANY, | |
| *Intervenor-Defendant*. | |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted November 21, 2024
San Jose, California

Filed August 22, 2025

Before: Michelle T. Friedland and Patrick J. Bumatay,
Circuit Judges, and Matthew F. Kennelly,* District Judge.

Opinion by Judge Friedland;
Dissent by Judge Bumatay

## SUMMARY**

### Federal Land Policy and Management Act of 1976

The panel affirmed the district court's summary judgment in favor of the Shoshone-Bannock Tribes of the Fort Hall Reservation ("the Tribes") in their action challenging a land exchange authorized by the Bureau of Land Management ("BLM") under the Federal Land Policy and Management Act of 1976 ("FLPMA").

In the exchange, BLM traded land that was formerly part of the Fort Hall Reservation of the Shoshone-Bannock Tribes for land owned by the J.R. Simplot Company. The Tribes had ceded that land to the United States in an 1898 agreement, which Congress ratified in 1900 (the "1900 Act").

---

* The Honorable Matthew F. Kennelly, United States District Judge for the Northern District of Illinois, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the 1900 Act precluded the land exchange. Section 5 of the 1900 Act specifies that the ceded Fort Hall lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." The exchange disposed of ceded Fort Hall lands under FLMPA, which is not a homestead, townsite, stone and timber, or mining law. Rather, it is a general land-management law. Even to the extent that FLPMA overlaps with Section 5's listed land disposal laws, the exchange was outside that area of overlap because the exchange disposed of ceded land to facilitate the expansion of a phosphogypsum waste facility, which is not a purpose encompassed within the categories of laws listed in Section 5. Accordingly, the exchange contravened Section 5's restrictions on the disposal of the ceded lands.

The panel held that FLPMA does not repeal or supersede the 1900 Act's restrictions on disposal. At most, it is ambiguous whether FLPMA does so, triggering application of the Indian canons of construction. One of the canons— the principle that Congress must clearly express its intent to abrogate a Tribe's treaty rights—resolves any ambiguity in favor of the interpretation advocated by the Tribes, given that Congress has not done so here.

Finally, the panel held that the anti-entrenchment principle, which provides that an earlier Congress cannot enact limitations on the exercise of legislative power by a future Congress, is not implicated here.

Accordingly, the panel held that because the 1900 Act precludes the exchange and FLPMA does not repeal or supersede the 1900 Act's restrictions on land disposal, BLM's authorization of the exchange was not in accordance with law under the Administrative Procedure Act. Given

that conclusion, the panel did not reach the district court's alternative grounds for invalidating the exchange.

Judge Bumatay dissented because in his view FLPMA governs the land exchange between BLM and Simplot, and the land exchange complied with FLPMA. The 1900 Act doesn't in any way limit or supplant FLPMA's procedures. In addition, the land exchange did not violate the National Environmental Policy Act.

## COUNSEL

Jill E. Grant (argued), Christina C. McClintock, and Andrea E. Gelatt, Jill Grant & Associates LLC, Washington, D.C.; Monte Gray (argued), Assistant General Counsel; William F. Bacon, General Counsel; Shoshone-Bannock Tribes, Fort Hall, Idaho; for Plaintiff-Appellee.

Andrew M. Bernie (argued), Daniel Halainen, and Robert J. Lundman, Attorneys, Environment & Natural Resources Division; Adam R.F. Gustafson, Acting Assistant Attorney General; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Miguel A. Estrada (argued), Jonathan C. Bond, and Max E. Schulman, Gibson Dunn & Crutcher LLP, Washington, D.C.; Patrick J. Fuster, Gibson Dunn & Crutcher LLP, Los Angeles, California; Thomas C. Perry, J.R. Simplot Company, Boise, Idaho; Stephen J. Odell, Marten Law LLP, Portland, Oregon; for Intervenor-Defendant.

Scott L. Campbell, Chief of Energy and Natural Resources Division; Raúl R. Labrador, Idaho Attorney General; Office

of the Idaho Attorney General, Boise, Idaho; Melissa A. Holyoak, Solicitor General; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; for Amici Curiae Idaho and Utah.

Josh Scholer, Deputy Counsel; Andy Snook, Senior Deputy Counsel; Brady Hall, General Counsel; Office of the Governor Brad Little, State of Idaho, Boise, Idaho; for Amici Curiae Governor Brad Little and Additional Governors Joe Lombardo and Spencer J. Cox.

Ragan E. Whitlock, Center for Biological Diversity, St. Petersburg, Florida; for Amici Curae the Center for Biological Diversity, Western Watersheds Project, WildEarth Guardians, Snake River Waterkeeper, Sierra Club, Waterkeeper Alliance, Portneuf Resource Council, People for Protecting Peace River, Bayou City Waterkeeper, ManaSota-88, Rise St. James, and Healthy Gulf.

William M. Jay and Isabel M. Marin, Goodwin Procter LLP, Washington, D.C.; Stephanie A. Maloney, U.S. Chamber Litigation Center, Washington D.C.; for Amicus Curiae the Chamber of Commerce of the United States.

Jeffrey H. Wood, Baker Botts LLP, Washington, D.C.; Christopher E. Tutunjian, Baker Botts LLP, Houston, Texas; Thomas P. Lynch, The Fertilizer Institute, Arlington, Virginia; Erica Klenicki and Michael A. Tilghman II, NAM Legal Center, Washington, D.C.; for Amici Curiae the National Association of Manufacturers and Fertilizer Institute.

Mary-Thomas Hart, National Cattlemen's Beef Association, Washington, D.C., for Amicus Curiae National Cattlemen's Beef Association.

Morgan E. Saunders, Native American Rights Fund, Washington, D.C.; Malia C. Gesuale and Kirsten D. Gerbatsch, Native American Rights Fund, Boulder, Colorado; for Amicus Curiae National Congress of American Indians.

Ashley C. Nikkel and Jim B. Butler, Parsons Behle & Latimer, Reno, Nevada, for Amicus Curiae National Mining Association.

**OPINION**

FRIEDLAND, Circuit Judge:

This interlocutory appeal requires us to determine the validity of a recent exchange of land between the Bureau of Land Management ("BLM") and the J.R. Simplot Company. In that exchange, BLM traded land that was formerly part of the Fort Hall Reservation of the Shoshone-Bannock Tribes ("the Tribes") for land owned by Simplot. The Tribes had ceded that land to the United States in an 1898 agreement, which Congress ratified in the Act of June 6, 1900, ch. 813, 31 Stat. 672 ("the 1900 Act"). The 1900 Act specifies categories of laws under which the ceded Fort Hall lands can be "disposed" (meaning transferred, including by sale or exchange) to private parties and reserves the Tribes' right to continue using any ceded land that has not been so disposed.

BLM authorized the land exchange under the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1787, which generally gives BLM authority to dispose of public lands. But the Tribes argue that the land exchange contravened the 1900 Act's restrictions on

disposal of the ceded Fort Hall lands. We agree with the Tribes that the 1900 Act precludes the land exchange, and we therefore affirm the district court's ruling invalidating it.

## I.

## A.

The Shoshone-Bannock Tribes are a federally recognized Indian Tribe whose permanent home is the Fort Hall Reservation. The Reservation, located in Idaho near the town of Pocatello, was established in 1868 under the terms of the Fort Bridger Treaty, 15 Stat. 673, between the Tribes and the United States.

In 1896, Congress authorized the Secretary of Interior to appoint a commission to negotiate with the Tribes for the "surrender" of a portion of the Reservation. Act of June 10, 1896, ch. 398, 29 Stat. 321, 341-42. That commission and the Tribes reached an agreement in 1898, in which the Tribes ceded a portion of the Fort Hall Reservation lands in exchange for $600,000. Agreement of February 5, 1898, 31 Stat. 672, 672-74 ("1898 Agreement"). The 1898 Agreement also specified that:

> So long as any of the [ceded lands] remain part of the public domain, [the Tribes] . . . shall have the right, without any charge therefor, to cut timber for their own use, . . . and to pasture their live stock on said public lands, and to hunt thereon and to fish in the streams thereof.

*Id.* at 674.

Congress ratified the 1898 Agreement in the 1900 Act, incorporating the 1898 Agreement verbatim and adding

several provisions. Those added provisions specify the processes by which the ceded Fort Hall lands can be removed from the public domain. In relevant part, Section 5 of the 1900 Act states that, after land allotments are made to certain individual Tribal members,[1] "the residue of said ceded lands shall be opened to settlement . . . and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only."[2] *Id.* at 676.

## B.

Simplot owns and operates the Don Plant, a phosphate-processing facility adjacent to the Fort Hall Reservation. The Don Plant manufactures phosphates for fertilizer through a process that produces a waste called phosphogypsum. Since 1994, Simplot has been seeking to complete a land exchange with BLM to enable Simplot to

---

[1] Section 4 of the 1900 Act specifies that the ceded lands shall first be allotted to Tribal members. 31 Stat. 672, 675. Allotment was a federal policy, common in the late 19th century, in which the government transferred former Tribal lands that had previously been collectively owned by Tribes to Tribal members individually. *See County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992).

[2] Homestead laws opened public lands for private settlement, and townsite laws authorized the disposal of public lands for building towns. *See, e.g.*, Act of May 20, 1862, ch. 75, 12 Stat. 392; Act of May 23, 1844, ch. 17, 5 Stat. 657. Stone and timber laws opened public lands to private use and ownership for growing timber and extracting stone. *See, e.g.*, Timber and Stone Act of 1878, ch. 151, 20 Stat. 89; Timber Culture Act of 1873, ch. 277, 17 Stat. 605. Mining laws opened public lands for mineral mining. *See, e.g.*, Mining Law of 1872, ch. 152, 17 Stat. 91.

expand the Don Plant's phosphogypsum disposal facilities.[3] Simplot contends that a land exchange is necessary because the Plant's existing phosphogypsum disposal facility is projected to reach capacity by 2031, and the Plant will not be able to continue operating if it runs out of phosphogypsum storage space.

## C.

In August 2020, BLM approved the Blackrock Land Exchange ("the Exchange").[4] BLM agreed to transfer to Simplot certain federal land that was part of the lands ceded by the Tribes in the 1898 Agreement. In return, Simplot agreed to transfer to BLM certain land that it owned.

BLM stated that it was approving the Exchange pursuant to its authority to dispose of public lands under FLPMA. FLPMA, enacted in 1976, declares a federal policy that "the public lands be retained in Federal ownership" except when the disposal of a particular parcel of land "will serve the national interest." 43 U.S.C. § 1701(a)(1). FLPMA establishes "uniform procedures" for the disposal of public lands, including by authorizing exchanges of public lands when "the Secretary concerned determines that the public

---

[3] An earlier attempt at the land exchange was halted after a court held that BLM's approval of the exchange violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347. *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of Interior*, No. 4:10-CV-004-BLW, 2011 WL 1743656, at *12 (D. Idaho May 3, 2011).

[4] The BLM's Record of Decision on the Exchange is available online. *See* U.S. Dep't of the Interior, Bureau of Land Mgmt., Blackrock Land Exchange, Record of Decision 3 (2020), https://eplanning.blm.gov/public_projects/119626/200293977/2002432 5/250030529/200818%20Blackrock%20Land%20Exchange%20Recor d%20of%20Decision-508%20final-shortened%20emails%20-%20typo%20fixed.pdf [https://perma.cc/2HBZ-HZ4A].

interest will be well served by making that exchange."  43 U.S.C. §§ 1701(a)(10), 1716(a).  FLPMA defines "public lands" to cover "any land and interest in land owned by the United States within the several States and administered by [BLM], without regard to how the United States acquired ownership."[5]  *Id.* § 1702(e).  When FLMPA was enacted, it expressly repealed a long list of laws that had previously governed disposal of public lands.  Pub. L. No. 94-579 §§ 702-03, 90 Stat. 2743, 2787-91 (1976).  The 1900 Act was not on that list.  The list of repealed statutes did include most homestead, townsite, stone and timber, and mining laws, with some exceptions—for example, FLPMA left certain mining laws in place, including the Mining Law of 1872, 30 U.S.C. §§ 22-54.[6]

The Tribes challenged the Exchange by filing suit in December 2020 against BLM, the Department of the Interior, and the Principal Deputy Assistant Secretary for Land and Minerals Management (collectively, "the Government") in the United States District Court for the District of Idaho.  Although the Tribes' complaint sought injunctive relief, they did not move for a temporary

---

[5] The scope of "public lands" is subject to two exclusions: "lands located on the Outer Continental Shelf" and "lands held for the benefit of Indians, Aleuts, and Eskimos."  43 U.S.C. § 1702(e).  The Tribes do not argue that either applies here, so we assume neither does for purposes of our analysis.

[6] The Mining Law of 1872 is still in effect but is currently subject to a moratorium under a separate statute.  *See* Dep't of the Interior and Related Agencies Appropriations Act of 1995, Pub. L. No. 103-332 §§ 112-13, 108 Stat. 2499, 2519 (1994).  FLPMA also left in place the Desert Lands Act of 1877, ch. 107, 19 Stat. 377, which was made applicable to the ceded Fort Hall lands in a separate statute, *see* Act of May 4, 1932, ch. 164, 47 Stat. 146.

restraining order or a preliminary injunction, and the Exchange was carried out that same month.

Simplot intervened in the suit as a defendant, and all parties cross-moved for summary judgment on the administrative record. In 2023, the district court granted summary judgment to the Tribes in relevant part. The court held that because the Exchange did not comply with the 1900 Act, BLM's approval of the Exchange violated the Administrative Procedure Act ("the APA"), 5 U.S.C. § 706(2)(A), and breached the United States' trust responsibility to the Tribes. The court also held, in the alternative, that BLM's approval of the Exchange failed to comply with the requirements of FLPMA and the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347. Instead of reaching the issue of remedies in the summary judgment order, the district court ordered the parties to confer and submit proposals for briefing on what remedies would be appropriate given that the Exchange had been carried out more than two years earlier.

Simplot then requested certification to file an interlocutory appeal under 28 U.S.C. § 1292(b), which the district court granted. The court concluded that the interplay between the 1900 Act and FLPMA was a controlling question of law for which there were substantial grounds for differences of opinion. The court further concluded that an immediate resolution of the question would materially advance the ultimate termination of the litigation because our court's review would "create certainty that [would] likely save substantial time and resources in litigating remedies," given the difficult questions that the district court would have to resolve about whether (and, if so, how) to unwind the Exchange.

Simplot timely petitioned for permission to appeal, and the Government filed a conditional petition to preserve its right to participate should Simplot's petition be granted. Our court granted the petitions under 28 U.S.C. § 1292(b).

## II.

"We review de novo the district court's decision on cross motions for summary judgment." *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 965 (9th Cir. 2021) (quoting *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007)). Under the APA, we set aside agency actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III.

### A.

The Tribes contend that the plain text of the 1900 Act does not allow the Exchange. We agree.[7]

Section 5 of the 1900 Act specifies that the ceded Fort Hall lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only*." 31 Stat. at 676 (emphasis added). That list of specific categories of laws, followed by the limiter "only," indicates that the listed categories comprise the exclusive set

---

[7] The Tribes also argue that BLM's approval of the Exchange breached the United States' trust responsibility to the Tribes. The Government does not dispute that a violation of the 1900 Act by BLM would breach the United States' trust responsibility. The Tribes further argue that the Exchange also violated a separate clause in the 1900 Act that states that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the land hereinbefore referred to." 31 Stat. at 676. The district court did not reach that issue, and we do not reach it on appeal.

of laws to be used for disposing of the lands ceded by the Tribes in the 1898 Agreement.  *See Only*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020) (defining "only" as "solely, exclusively"); *see also, e.g.*, *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 334 (1994) (interpreting a list beginning with "only" as an exclusive list); *Fed. Lab. Rels. Auth. v. Aberdeen Proving Ground, Dep't of the Army*, 485 U.S. 409, 412 (1988) (per curiam) ("The phrase 'only if' denotes exclusivity.").

The Exchange disposed of ceded Fort Hall lands under FLPMA.  FLPMA is not a homestead, townsite, stone and timber, or mining law.  Rather, it is a general land-management law that governs "any land and interest in land owned by the United States within the several States and administered by [BLM]" and that establishes "uniform procedures" for the disposal of those lands.  43 U.S.C. §§ 1702(e), 1701(a)(10).  FLPMA's scope is wider than the combination of all the categories of land disposal laws covered in Section 5.  And even to the extent that FLPMA overlaps with Section 5's listed land disposal laws, the Exchange is outside that area of overlap:  Here, the Exchange disposed of ceded land to facilitate the expansion of a phosphogypsum waste facility, which is not a purpose that would be encompassed within the categories of laws listed in Section 5.  The Exchange therefore contravened Section 5's restrictions on the disposal of the ceded lands.

The Government and Simplot (collectively, "Defendants"), offer several arguments why we should not interpret Section 5 to restrict the options for disposing of the ceded Fort Hall lands.  Defendants' proposed interpretations of Section 5, however, are not consistent with the 1900 Act's text or its historical context.

The Government contends that the categories of laws listed in Section 5 represent "essentially the full range" of federal statutes that covered disposal of public lands in 1900. Because Section 5 was intended to allow for disposal of the ceded lands under all the federal legal authorities then in effect, the Government argues, Section 5 should now be interpreted to allow for disposal under all current federal laws that authorize land disposal, including FLPMA.

But contrary to the Government's premise, the categories of laws listed in Section 5 did not encompass the full range of public-land disposal statutes that existed in 1900. Other Tribal land cession agreements that were ratified during the same period and included provisions similar—but not identical—to Section 5 specified options for removing ceded lands from public ownership that were absent from the 1900 Act, including under laws governing disposal of "coal lands" and "desert lands." Act of May 1, 1888, ch. 213, § 3, 25 Stat. 113, 133 (opening ceded lands under "the laws governing the disposal of coal lands, desert lands, and mineral lands"); Act of May 30, 1908, ch. 237, § 7, 35 Stat. 558, 561 (specifying that ceded lands shall be disposed of "under the general provisions of the homestead, desert-land, mineral, and town-site laws"). The 1900 Act's omission of such land laws indicates that Congress did not intend to capture the full range of public-land disposal statutes.

Indeed, other Tribal land cession statutes enacted during the same period expressly allowed for disposal under all public-land laws. *See, e.g.*, Act of Aug. 15, 1894, ch. 290, § 17, 28 Stat. 305, 336 (stating that ceded lands "shall . . . be subject to disposal *under the provisions of the general land laws*" (emphasis added)). That Congress chose not to use such language in the 1900 Act further shows that Congress did not intend to include all public-land disposal statutes.

Subsequent Congresses, moreover, enacted statutes seemingly based on the presumption that the 1900 Act did not allow for land disposal under all statutory methods. In 1926 and 1932, Congress amended Section 5 to expand the disposal options for the ceded Fort Hall lands by allowing for disposal under a desert lands statute and a statute governing disposal of isolated tracts of land. Act of May 19, 1926, ch. 337, 44 Stat. 566; Act of May 4, 1932, ch. 164, 47 Stat. 146. Those amendments would not have been necessary unless Congress understood Section 5 to restrict disposal options to the listed categories of laws.

Another problem with the Government's argument is that it would seem to render Section 5's qualifier "only" superfluous. The Government argues that the purpose of "only" was to prohibit disposal via methods outside the then-existing federal statutory framework. The Government, however, does not offer any example of a disposal method that would be excluded from Section 5 under that reading.

Simplot attempts to offer a non-superfluous interpretation of "only." Simplot contends that the term "only" in "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only," 31 Stat. at 676, should be read to modify the immediately preceding phrase "laws of the United States." Under Simplot's interpretation, the phrase "laws of the United States only" means that disposal can occur under any federal law—but only under federal law, not under state law.

There are two problems with that interpretation. First, it reads the entire phrase "homestead, town-site, stone and timber, and mining" out of the statute. Under Simplot's view, Section 5 conveys that any federal statute can authorize disposal of the ceded Fort Hall lands, so Section

5's list of specific categories of laws has no purpose. Second, Simplot's interpretation is an unnatural reading of the provision as a whole. The phrase "laws of the United States" modifies each item in the list of statutory categories ("homestead, townsite, stone and timber, and mining"), such that "only" should be read as a limiter on the entire listed set of statutory categories. In other words, the best reading is that the ceded lands may be disposed of only under the listed categories of federal laws.

Defendants rely on the legislative history of bills amending the 1900 Act to support their non-restrictive reading of Section 5, but that reliance is unavailing. As an initial point, "[t]here is no need to consult extratextual sources when the meaning of a statute's terms is clear." *McGirt v. Oklahoma*, 591 U.S. 894, 916 (2020). Extratextual materials are useful only to "clear up," rather than "'create[,]' ambiguity about a statute's original meaning." *Id.* (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)). The plain meaning of the 1900 Act is clear, so there is no reason for us to look to the legislative history. Moreover, Defendants' evidence comes primarily from subsequent amendments to the 1900 Act and therefore is "less illuminating than . . . contemporaneous evidence" from the passage of the 1900 Act. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001) (quoting *Hagen v. Utah*, 510 U.S. 399, 420 (1994)).

Even if the legislative history of subsequent laws could be informative, the legislative history invoked here would at most provide equivocal evidence about the meaning of the 1900 Act. The Government points to a House report on a

1904 bill amending the 1900 Act,[8] which described Section 5 of the 1900 Act as opening the ceded lands "to settlement and appropriation *under the general laws of the United States*."  H.R. Rep. No. 57-3161, at 2 (1903) (emphasis added).  Although that statement could support interpreting Section 5 to broadly allow for disposal under any public-land laws, other legislative history from a different amendment to the 1900 Act supports the opposite interpretation.  In 1926, Congress amended the 1900 Act to add laws regarding the disposal of isolated tracts of land to the list of statutes providing disposal options.  A House report accompanying the 1926 bill incorporated a statement by the Secretary of Interior that the 1900 Act "did not extend the provisions of the isolated tract laws to the lands, and under the construction given by the [Department of Interior] in similar cases *no laws other than those specifically extended to the lands are applicable thereto*."  S. Rep. No. 69-685, at 2 (1926) (emphasis added).  Congress in 1926 apparently agreed with the Secretary of Interior's assessment because it otherwise would not have been necessary to add isolated-tract laws to the 1900 Act's list of available land disposal options.

Simplot further argues that reading Section 5 to restrict future disposal options for the ceded Fort Hall lands would conflict with the purpose of the 1900 Act, which was to support a then-prevailing federal policy that encouraged "the population's westward expansion" and "private settlement and development of public lands."  The 1900 Act was indeed enacted against a backdrop of westward expansion and

---

[8] The 1904 bill eliminated a requirement imposed by the 1900 Act that ceded lands within five miles of the town of Pocatello be sold at public auction.  *See* Act of March 30, 1904, ch. 854, 33 Stat. 153 (1904).

private settlement on former Tribal lands. *See Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 106 (1998).  But Congress apparently did not have a policy preference to allow for disposal of ceded lands by any means whatsoever because it enacted numerous land cession statutes during that period that listed the specific categories of laws to be used for disposal of ceded lands, and those statutes often clearly stated that the listed categories comprised the sole disposal options for the ceded lands. *See, e.g.*, Act of May 1, 1888, ch. 213, § 3, 25 Stat. 113, 133 (specifying that ceded lands are open to entry under "the laws regulating homestead entry . . . and to entry under the town site laws and the laws governing the disposal of coal lands, desert lands, and mineral lands; *but are not open to entry under any other laws regulating the sale or disposal of the public domain*" (emphasis added)); Act of Jan. 14, 1889, ch. 24, § 6, 25 Stat. 642, 644 (specifying that ceded lands "shall be disposed of by the United States to actual settlers *only* under the provisions of the homestead law" (emphasis added)).  The similarly restrictive language of Section 5 of the 1900 Act belies Simplot's contentions about Congress's purpose and policy preferences.  In any event, "no amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021).

## B.

Having interpreted the 1900 Act's list of disposal options as exclusive, we next consider Defendants' various arguments contending that FLPMA repeals or supersedes that exclusivity.  We conclude that the best interpretation of FLPMA is that it does not repeal or supersede the 1900 Act's restrictions on disposal.  At most, it is ambiguous whether FLPMA does so, triggering application of the Indian canons of construction.  And, as explained in Part III.C below, one

of the Indian canons—the principle that Congress must clearly express its intent to abrogate a Tribe's treaty rights— resolves any ambiguity in favor of the interpretation advocated by the Tribes, given that Congress has not done so here.

### 1.

Because FLPMA broadly defines "public lands" and provides for their disposal by exchange, it is clear that if the 1900 Act did not exist, FLPMA would permit disposal of the ceded Fort Hall lands.  *See* 43 U.S.C. §§ 1702(e), 1716.  It is also clear that FLPMA contains no express repeal of the 1900 Act's restrictions on disposal of the ceded Fort Hall lands.  Still, the Government and Simplot urge us to read FLPMA as impliedly repealing or superseding those restrictions.

### a.

Although a later-enacted statute "can sometimes operate to amend or even repeal an earlier statutory provision . . . , 'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'"  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (second alteration in original) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)).  FLPMA reveals no "clear and manifest" intent to amend or repeal Section 5 of the 1900 Act—to the contrary, FLPMA plainly states an intent not to do so.  When Congress passed FLPMA, it expressly repealed or struck portions of 147 laws, and it marked an additional 104 laws for repeal effective on FLPMA's tenth anniversary. §§ 702-03, 90 Stat. at 2787-91.  The list of repealed laws includes many laws governing disposal of public lands, but, critically, does not include the 1900 Act.  And, in Section

701 of FLPMA, Congress emphasized the exclusivity of that list, stating that outside of the list of explicitly repealed laws, "[n]othing in this Act shall be deemed to repeal any existing law by implication." § 701(f), 90 Stat. at 2786.[9] Section 701's clear statement against implied repeal shows that Congress did not intend to repeal any laws beyond those listed and thus shows that FLPMA did not implicitly repeal the disposal restrictions in Section 5.[10]

Simplot argues that the enactment of FLPMA as a comprehensive land management law automatically repealed specific disposal laws that impose restrictions not contained in FLPMA.[11] But if that were true, Congress would have had no reason to explicitly repeal so many other disposal laws. The plain text and structure of FLPMA indicate that Congress did not intend any such automatic repeal.

---

[9] Simplot suggests that because this provision is not codified, it should be ignored. But "it is the Statutes at Large that provides the legal evidence of laws," despite the U.S. Code's omission of any particular provision. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (quotation marks omitted).

[10] A Senate report accompanying FLPMA further underscored that intent: "The list of laws to be repealed is specific. The bill would not repeal or modify any law or segment of law not specifically contained in that list." S. Rep. No. 94-583, at 26-27 (1975).

[11] Simplot also points to a separate provision of FLPMA, 43 U.S.C. § 1715(a), which grants the Secretary of Interior authority to acquire land "[n]otwithstanding any other provisions of law." Simplot argues that the use of "notwithstanding" in § 1715(a) supersedes any conflicting provision in the 1900 Act. But § 1715(a) governs *acquisition* of land under FLPMA, not *disposal* of land, so that provision has no relevance here.

By contrast, as noted above, several other statutes passed after the 1900 Act *did* modify Section 5, including by clearly and expressly adding disposal options for the ceded lands. *See* Act of March 30, 1904, ch. 854, 33 Stat. 153 (eliminating a requirement imposed by the 1900 Act that sales of any parts of the ceded lands within five miles of the town of Pocatello occur through public auction), Act of May 19, 1926, ch. 337, 44 Stat. 566 (making a prior statute on disposal of isolated tracts of land "applicable to the ceded lands on the former Fort Hall Indian Reservation"); Act of May 4, 1932, ch. 164, 47 Stat. 146 (making a prior statute on disposal of desert lands "applicable to the ceded lands on the former Fort Hall Indian Reservation"); Act of May 12, 1920, ch. 181, 41 Stat. 596 (conveying specifically described tracts of land within the ceded Fort Hall lands to the city of Pocatello). Those statutes, which specifically refer to the ceded Fort Hall lands and therefore express an intent to add to the disposal methods listed in Section 5, illustrate that Congress knows how to properly add to Section 5's disposal options when it wants to do so.

Simplot points to FLPMA's express repeal of the Act of May 19, 1926, in support of its contention that FLPMA applies to the ceded Fort Hall lands and thus supersedes the 1900 Act's restrictions on disposal. The 1926 Act, which had applied a statute governing disposal of isolated tracts of land to the ceded Fort Hall lands, was included in a list of isolated tract laws that FLPMA marked for repeal. § 703(a), 90 Stat. at 2790. Under Simplot's view, that express reference to the 1926 Act shows that FLPMA was, by extension, intended to apply to the ceded Fort Hall lands. Simplot argues that the reference makes FLPMA analogous to the other statutes that added to the 1900 Act's disposal options.

But unlike those statutes, FLPMA did not reference the 1900 Act or name the ceded Fort Hall lands—instead, it merely included the 1926 Act in its list of repealed isolated tract laws. That reference to the 1926 Act does not provide a clear expression of intent to repeal or modify the 1900 Act's disposal restrictions. To the contrary, it reinforces the narrowness of those restrictions by eliminating one disposal option, under which any isolated tracts of the ceded Fort Hall land would have been readily disposable. Also, unlike the other statutes that added individual narrow disposal options onto the 1900 Act's list of permissible disposal options, interpreting FLPMA to amend the 1900 Act would not merely add a discrete category for disposal of the ceded Fort Hall lands while leaving Section 5 otherwise intact. Rather, FLPMA sets forth a comprehensive framework for land disposal, and its application to the ceded Fort Hall lands would functionally repeal the 1900 Act's disposal restrictions by broadly enabling disposal of the ceded lands for purposes far outside those encompassed within the categories of laws listed in Section 5. FLPMA's singular reference to the 1926 Act (which in turn references the ceded Fort Hall lands) is insufficient to demonstrate Congress's intent to wholly repeal the 1900 Act's disposal restrictions. At most, it creates ambiguity as to whether FLPMA impliedly repealed Section 5.

That Congress would repeal the 1926 Act but leave the 1900 Act's disposal restrictions in place is consistent with FLPMA's overarching purpose. With FLPMA's enactment, Congress declared a policy that "the public lands be *retained* in Federal ownership." 43 U.S.C. § 1701(a)(1) (emphasis added); *see also* S. Rep. No. 94-583, at 24 (1975) ("[T]he Nation has come to regard [federally owned lands] as a permanent national asset which, for the most part, should be

retained and managed."). Congress's focus on the retention of public lands would align with its decision to repeal the 1926 Act, which opened the ceded Fort Hall lands to an additional disposal method, but to keep in place the 1900 Act, which restricts disposal of the ceded Fort Hall lands.

The history behind FLPMA's enactment further suggests that Congress did not intend to repeal Section 5's disposal restrictions. FLPMA's enactment followed an extensive investigation by the congressionally created Public Land Law Review Commission into the country's public-land laws and history. *See* Paul W. Gates, Pub. Land L. Rev. Comm'n, History of Public Land Law Development (1968); Pub. Land L. Rev. Comm'n, One Third of the Nation's Land (1970). The Commission's reports informed FLPMA's express repeal of many public-land laws, including the 1926 Act and other statutes that had applied disposal laws to other ceded Tribal lands. *See, e.g.*, § 702, 90 Stat. at 2787 (repealing Act of June 13, 1902, ch. 1080, 32 Stat. 384, which had applied homestead laws to former Ute Indian Reservation lands); § 703(a), 90 Stat. at 2790 (repealing Act of February 9, 1903, ch. 531, 32 Stat. 820, which had applied townsite laws to former Tribal lands in Minnesota). The Commission's careful and extensive investigatory work preceding those repeals suggests that FLPMA's drafters would have been aware of the 1900 Act and that their omission of Section 5 from the list of repealed laws thus reflects that they chose not to modify it.

### b.

The interplay between the 1900 Act and FLPMA is best understood under the interpretive principle that "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more

generalized spectrum . . . '[w]here there is no clear intention otherwise.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 550 (1974)); *Nat'l Ass'n of Home Builders*, 551 U.S. at 663 (same). In *Radzanower*, the Supreme Court held that a narrow provision in an earlier-enacted statute that restricts venue options for lawsuits against national banks was not effectively repealed by the later-enacted Securities Exchange Act, which includes a broad provision setting venue rules for securities lawsuits. 426 U.S. at 149-50, 158. The Court reasoned that because the earlier Congress was focused on the narrow, "particularized problem[]" of determining venue in suits against national banks and the later Congress was focused broadly on the "objective of promoting fair dealing in the securities markets," the later-enacted statute "[should] not be considered as intended to affect the more particular," earlier-enacted statute, absent some "clear intention otherwise." *Id.* at 153-54 (quotation marks omitted). Based on that interpretation, the Court applied the narrow venue rule and held that venue was improper even though the later, broader venue provision would have allowed the suit. *Id.* at 158. Similarly, here, because the 1900 Act is narrowly drawn and specifically applicable to the ceded Fort Hall lands, and because FLPMA applies broadly to all public lands and does not reveal a clear intent to repeal the 1900 Act's restrictions on disposal, FLPMA should not be read to effectively repeal the 1900 Act's restrictions, which continue to govern disposal of the ceded lands. The principle in *Radzanower* also distinguishes FLPMA's broad mandate from the other statutes that applied narrowly to the ceded Fort Hall lands and amended the 1900 Act by adding discrete options for those lands' disposal.

*National Association of Home Builders* provides another application of that principle.  There, the Supreme Court considered whether Section 402(b) of the Clean Water Act, a specific provision requiring the Environmental Protection Agency to delegate permitting responsibility to state governments that can perform a list of nine particular functions, was repealed by a later-enacted Endangered Species Act provision that broadly requires all federal agencies to ensure that any action they authorize will not jeopardize endangered species.  *Nat'l Ass'n of Home Builders*, 551 U.S. at 662.  The Court held that the Endangered Species Act's broad mandate could not be read to require the Environmental Protection Agency to determine whether the delegation of permitting responsibility to a state would jeopardize any endangered species, because such an interpretation would "effectively repeal § 402(b)'s statutory mandate by engrafting a tenth criterion" to its listed set of nine criteria.  *Id.* at 663.  Here, reading FLPMA to apply to the ceded Fort Hall lands would engraft onto Section 5 an additional—very broad—disposal option that would effectively subsume Section 5's restrictions on disposal, without a clear expression of Congress's intent to do so.

To argue otherwise, Simplot points to *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), where the Supreme Court held that a later statute did impliedly repeal part of an earlier statute.  *Argentine Republic* involved the Alien Tort Statute, which grants federal district courts jurisdiction over tort actions by noncitizens for violations of international law, and the later-enacted Foreign Sovereign Immunities Act of 1976 ("the FSIA"), which governs immunities of foreign states.  *Id.* at 432-34.  The FSIA prohibits jurisdiction over suits against

foreign states in some instances where the Alien Tort Statute would permit jurisdiction. *See id.* The Court concluded that, despite the FSIA's lack of any express repeal of the conflicting portions of the Alien Tort Statute, Congress nevertheless intended that the FSIA be the "sole basis" for obtaining jurisdiction over foreign states. *Id.* at 434, 436.

*Argentine Republic* is of no assistance to Defendants. There, the Court explained that it was *not* a case "where a more general statute is claimed to have repealed by implication an earlier statute dealing with a narrower subject." *Id.* at 438. Indeed, the later-enacted FSIA was arguably the narrower statute of the two because "[t]he Alien Tort Statute by its terms does not distinguish among classes of defendants," whereas the FSIA applies only to foreign state defendants. *Id.* The Court in *Argentine Republic* also put diminished weight on the FSIA's lack of a clear statement of repeal because, at the time the FSIA was enacted, no court had yet held that the Alien Tort Statute conferred jurisdiction in suits against foreign states. *Id.* at 436. So, the Court reasoned, Congress may not have even understood there to be tension between the statutes. *Id.* By contrast, the study of land laws preceding the enactment of FLPMA makes it likely that Congress was aware of the 1900 Act's restrictions on disposal.

## 2.

Simplot relatedly argues that even if we conclude that FLPMA did not repeal the 1900 Act's restrictions on disposal, our duty to harmonize statutes requires us to read FLPMA as creating an additional source of land disposal authority for the ceded Fort Hall lands. Under the principle of harmonization, courts cannot "'pick and choose among congressional enactments' and must instead strive 'to give

effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *Morton*, 417 U.S. at 551). That principle requires courts to "regard each [statute] as effective" if they are "capable of co-existence." *Morton*, 417 U.S. at 551. In Simplot's view, we must harmonize the 1900 Act and FLPMA by reading Section 5 as setting out only the *initial* disposal options and allowing later-enacted laws like FLPMA to expand disposal authority over the ceded lands.

But harmonizing the 1900 Act and FLPMA does not require the approach Simplot urges. The 1900 Act's specific restrictions govern the ceded Fort Hall lands while FLPMA's general land disposal rules govern other public lands. That coexistence is consistent with the Supreme Court's reasoning in *Morton*, where the Court held that a statutory provision creating an employment preference for "qualified Indians" in the Bureau of Indian Affairs could "readily co-exist" with a general statute broadly prohibiting employment discrimination on the basis of race. *Id.* at 538, 550. There, the Court viewed the harmonization principle as preventing it from reading a statute of "general application" to nullify a "specific provision applying to a very specific situation," absent evidence of congressional intent to nullify the specific provision. *Id.* at 550-51. Under that same reasoning, we satisfy our duty to harmonize statutes by giving effect to the 1900 Act's specific restrictions on disposal of the ceded Fort Hall lands and FLPMA's rules for disposal of other lands. Both statutes are valid and "enjoy[] separate spheres of influence." *Epic Sys. Corp.*, 584 U.S. at 503.

Our decision in *Blackfeet Indian Tribe v. Montana Power Co.*, 838 F.2d 1055 (9th Cir. 1988), does not dictate otherwise. In *Blackfeet Indian Tribe*, we held that fifty-year right-of-way easements for natural gas pipelines across a

Reservation could be allowed through the harmonization of two statutes: an earlier statute that allows the Secretary of Interior to grant oil and gas rights of way across Tribal lands for a maximum term of twenty years with the Tribe's consent, and a later statute that allows the Secretary to grant rights of way across Tribal lands for any purpose for any length of time with the Tribe's consent. *Id.* at 1056-58. Simplot contends that *Blackfeet Indian Tribe* should be read to allow general statutes to add broader options for the handling of land than those provided in earlier, specific statutes. But central to the reasoning in *Blackfeet Indian Tribe* was that the Tribe's consent was the key requirement for a right of way to be granted under both statutes. *Id.* at 1058. Because, under either statute, "the Tribe [would] preserve[] its election and its ability to protect Tribal interests," the two statutory methods for granting a right of way could live alongside each other "while still preserving their sense and purpose." *Id.* By contrast, reading FLPMA to allow additional disposal options would effectively remove the qualifier "only" from Section 5 and thus would fundamentally alter the 1900 Act's plain meaning.

## 3.

The Government next argues that BLM's authorization of the Exchange under FLPMA is consistent with the 1900 Act in light of the "reference canon" of statutory interpretation. Under the reference canon, "when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209 (2019) (citing 2 J. Sutherland, Statutory Construction §§ 5207-5208 (3d ed. 1943)). The logic of the canon is that a general reference to a body of law indicates an intent to continue referencing that body of law even as it evolves. By contrast,

a statute's specific reference to another statute by title or number "in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." *Id.* at 209-10. In the Government's view, the laws listed in Section 5 of the 1900 Act referenced all federal land disposal statutes and FLPMA serves as the modern federal land disposal statute, so disposal of the ceded land under FLPMA is consistent with the 1900 Act.

But applying the reference canon here does not lead to the Government's desired conclusion. As explained in Part III.A, the 1900 Act's referenced laws (homestead, townsite, stone and timber, and mining) are specific categories of land disposal laws that do not comprise the full body of land disposal laws that existed in 1900. The list of laws is further rendered exclusive by the limiter "only." Thus, the "general subject" to which Section 5 refers is not public-land laws generally but a more limited set of land disposal laws. *Id.* at 209. No one has argued that the purpose of the Exchange is related to homestead, townsite, stone and timber, or mining laws. Rather, the Exchange's purpose is to facilitate waste disposal.

Relying on *Jam v. International Finance Corp.*, the Government argues that the 1900 Act's reference to land disposal laws encompasses FLPMA even though FLPMA embodied a fundamental change in land management law. In *Jam*, the Supreme Court considered a 1945 statute that tied the immunity of international organizations to the law of foreign-government immunity. *Id.* at 203. In 1945 foreign-government immunity was "virtually absolute," but in 1976 Congress had enacted the FSIA, allowing federal courts to exercise jurisdiction in many more suits against foreign governments. *Id.* at 204 (quotation marks omitted).

Despite that substantial interim change, the Court read the 1945 statute to reference foreign-government immunity law in its newer form, encompassing the changes from the FSIA. *Id.* at 207, 210.

The circumstances of *Jam*, however, are not analogous to those presented here. The 1945 statute's reference to foreign-government immunity was expansive enough to accommodate the FSIA's transformations to that body of law. As the Supreme Court explained, the 1945 statute's specification that international organizations receive the "same immunity . . . as is enjoyed by foreign governments," *id.* at 202 (quoting 22 U.S.C. § 288a(b)), was "an instruction to look up the applicable rules of foreign sovereign immunity, wherever those rules may be found." *Id.* at 211. By contrast, Section 5, which specifically references "homestead, townsite, stone and timber, and mining laws," is not broad enough in scope to encompass the Exchange.

## C.

Any ambiguity as to whether FLPMA repeals or supersedes the 1900 Act's restrictions on disposal must be resolved by the Indian canons of construction. The Indian canons are "'rooted in the unique trust relationship' between the United States and the sovereign tribes, who stood in an unequal bargaining position" when negotiating treaties and agreements. *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1163 (9th Cir. 2017) (quoting *Oneida County v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 247 (1985)). One longstanding principle of federal Indian law, which we refer to as the clear statement canon, applies here and dictates that the 1900 Act's restrictions on land disposal remain in effect and preclude the Exchange.

Under the clear statement canon, any federal statute that abrogates a Tribe's treaty rights must clearly express Congress's intent to do so. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Id.* at 202-03 (quoting *United States v. Dion*, 476 U.S. 734, 740 (1986)). Although Congress certainly has the power to modify Tribes' rights, the United States' trust responsibility to Tribes requires the preservation of Tribal rights unless Congress's contrary intent is clear and unambiguous. *See id.*; *Oneida*, 470 U.S. at 247.

Section 5's restrictions on land disposal directly bear on the Tribes' treaty rights that were reserved in the 1898 Agreement and codified in the 1900 Act. Title IV of the 1898 Agreement, copied verbatim in the 1900 Act, states:

> So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, [the Tribes] . . . shall have the right, without any charge therefor, to cut timber for their own use, . . . and to pasture their live stock on said public lands, and to hunt thereon and to fish in the streams thereof.

31 Stat. at 674. The 1900 Act thus reserves the Tribes' usufructuary rights to the ceded lands for as long as the lands

remain public.[12]  Indeed, our court has already recognized those rights:  In *Swim v. Bergland*, 696 F.2d 712 (9th Cir. 1983), we held that the Tribes' grazing rights on the original Fort Hall Reservation lands were established in the 1868 treaty that created the Reservation, and that the 1898 Agreement reserved those continued grazing rights for the Tribes despite the cession of their possessory rights to the land. *Id.* at 715-16. *Swim*, moreover, observed that by 1898 the Tribes "had begun to rely on the production of meat" from their herds grazing on lands ceded in the 1898 Agreement. *Id.* at 716.  Abrogating those usufructuary rights (by expanding the methods under which the ceded lands can be removed from the public domain) would require a clear expression of congressional intent, which FLPMA does not provide.

Contrary to Defendants' contentions, the conditional nature of the Tribes' usufructuary rights in the 1900 Act does not negate the principle that Congress must speak clearly to abrogate those rights.  In *Herrera v. Wyoming*, 587 U.S. 329 (2019), the Supreme Court rejected an argument that the Crow Tribe's usufructuary treaty rights on non-reservation lands—which exist so long as, inter alia, the relevant lands belong to the United States and remain unoccupied—were "temporary and precarious" and thus could be impliedly extinguished upon Wyoming's statehood. *Id.* at 340 (quotation marks omitted).  Despite the conditional nature of

---

[12] The dissent contends that any application of the clear statement canon would render "Congress's enactment of the 1904 Act, 1920 Act, 1926 Act, and 1932 Act . . . invalidated," Dissent at 58, but application of the clear statement canon plainly does not require that result.  The 1904 Act, the 1920 Act, the 1926 Act, and the 1932 Act all expressly add disposal options to the ceded lands specifically. *See supra* pages 21.  FLPMA, by contrast, does not do so.

the Crow Tribe's usufructuary rights, the Court still looked to whether Congress had expressly abrogated those treaty rights. *Id.* at 344-45. Similarly, here, the relevant inquiry is whether FLPMA provides a clear indication of Congress's intent to abrogate the Tribes' usufructuary rights, which it does not.[13]

## D.

Defendants also raise broader practical concerns. Simplot urges that the Don Plant is "crucial to the Nation's production of high-quality fertilizer" and that it needs to acquire the land to continue operations. The possibilities of negative economic consequences, however, cannot overcome the 1900 Act's plain meaning. *See McGirt*, 591 U.S. at 923 (rejecting the "unspoken message . . . that we should be taken by the 'practical advantages' of ignoring the written law").

---

[13] Other Indian canons of construction instruct that courts should construe Tribal treaties and agreements, as well as statutes that expressly focus on Native Americans, liberally in favor of Tribes and resolve all ambiguities in Tribes' favor. *See, e.g.*, *Oneida*, 470 U.S. at 247 (explaining the "well established" principle that Indian treaties should be interpreted liberally in Tribes' favor); *Antoine v. Washington*, 420 U.S. 194, 199 (1975) (applying that same principle to "statutes ratifying agreements with the Indians"); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766-68 (1985) (construing "in favor of the Indians" a statute that authorized mineral leasing of Indian lands); *County of Yakima*, 502 U.S. at 269-70 (construing in Tribes' favor an ambiguous provision of a Tribal land allotment statute). Those canons would appear to further require that we construe the 1900 Act in the Tribes' favor, but we need not even consider them here because the 1900 Act is clear due to its plain text that it restricts the disposal options for the ceded Fort Hall lands, and any ambiguity as to whether FLPMA supersedes the 1900 Act's restrictions is resolved by the clear statement canon.

The Government argues that ruling in favor of the Tribes would create the "anomalous" result that the ceded Fort Hall lands could not be disposed of at all without congressional action. But our ruling leads to no such result. Our holding is limited to this particular exchange, and we do not reach whether other instances of land disposal for purposes related to the laws listed in the 1900 Act, such as timber or mining, could be permissible. Regardless, as noted above, we are not permitted to "rewrite the statute that Congress has enacted" to reach a favored policy outcome. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 130 (2016) (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005)).

**E.**

Finally, we address the dissent's argument that the foregoing reasoning violates the anti-entrenchment principle, which provides that an earlier Congress cannot enact limitations on the exercise of legislative power by a future Congress. We disagree that the anti-entrenchment principle is implicated here.

Faced with statutory provisions seeking to impose additional procedural requirements on future Congresses, the Supreme Court has at least sometimes declined to read those requirements as binding future Congresses. *See, e.g.*, *Dorsey v. United States*, 567 U.S. 260, 272-74 (2012). In *Dorsey*, the Supreme Court considered a law stating that new criminal statutes that repeal older statutes shall not change the penalties incurred under the older statutes "unless the repealing Act shall so expressly provide." *Id.* at 272 (quoting 1 U.S.C. § 109). The Court declined to read that law to require an express statement of repeal to change penalties in a new criminal statute because of the principle that "statutes enacted by one Congress cannot bind a later

Congress." *Id.* at 274. Rather, Congress remained free to modify the older statutory provisions and "express any such intention either expressly or by implication as it chooses." *Id.*; *see also Reichelderfer v. Quinn*, 287 U.S. 315, 317-18 (1932) (declining to read a statute that "perpetually dedicated and set apart" land for use as a public park to prohibit later Congresses from devoting that land to other uses).

Unlike the relevant statute in *Dorsey*, the 1900 Act does not contain any language imposing additional procedural requirements on Congress or otherwise limiting the ways in which Congress could repeal it in the future. If Congress had chosen to amend the 1900 Act's restrictive list, it could have done so without needing to follow any extra procedures (as it has on several occasions). *See supra* Part III.B.1. In FLPMA, however, Congress did not do so.

Accordingly, our task here is merely to determine whether the 1900 Act's list of disposal options for the ceded Fort Hall lands is restrictive—we conclude that it is—and whether FLPMA indicates any congressional intent to repeal or supersede that restrictive list—we conclude that it does not. The only elements of our analysis that might plausibly implicate a notion of a constraint on Congress are the Indian law canon that requires a clear expression of congressional intent to abrogate a treaty right and the general interpretive canon that repeals by implication are not presumed unless Congress's intent is clear. But requiring *courts* to examine whether Congress has spoken clearly in a given context is not what concerned the Court in *Dorsey*. Here, there is no binding of a later Congress to some procedure selected by an earlier Congress as there was in *Dorsey*—clear statement canons have nothing to do with one Congress binding a later Congress at all. And even if the need to speak clearly could

be seen as an additional procedural requirement that Congress must satisfy, the Supreme Court has long applied the clear statement canons at issue here without questioning their legitimacy in light of the anti-entrenchment principle or any other principle. *See, e.g.*, *Mille Lacs*, 526 U.S. at 202-03 (requiring a clear expression of Congress's intent to abrogate an Indian treaty right); *Herrera*, 587 U.S. at 344-45 (same); *Radzanower*, 426 U.S. at 154-57 (applying the presumption against implied repeals); *Nat'l Ass'n of Home Builders*, 551 U.S. at 662-63 (same).

\* \* \*

Because the 1900 Act precludes the Exchange and FLPMA does not repeal or supersede the 1900 Act's restrictions on land disposal, BLM's authorization of the Exchange was "not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). Given that conclusion, we need not reach the district court's alternative grounds for invalidating the Exchange.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to the Tribes.

BUMATAY, Circuit Judge, dissenting:

The three rules of real estate are simple: location, location, location. That's as true here as anywhere else. J.R. Simplot Company, an agribusiness, set its eyes on a plot of federally owned forest land next to its fertilizer plant near Pocatello, Idaho. The land is, for Simplot, an ideal location to store the chemical byproducts of its fertilizer production factory. The added land would allow the company to continue running its factory for decades, which is vital to the local and national economy. For others, however, the land is only useful for agricultural, recreational, or wildlife-preserve purposes. So more than thirty years ago, Simplot proposed an exchange with the federal Bureau of Land Management. It offered to give the federal government other parcels of land valuable to the public in return for the federal land. But this exchange has been mired in litigation ever since. That's because the federal land was once owned by the Shoshone-Bannock Tribes ("Tribes"), who seek to stop the land exchange even though they ceded the property to the United States over 125 years ago.

This dispute begins and ends with the Federal Land Policy and Management Act ("FLPMA"), 43 U.S. § 1701 *et seq*. In 1976, Congress enacted FLPMA to create a uniform, comprehensive system for disposing of and acquiring public lands. Before FLPMA, an unwieldy patchwork of laws governed the management of public lands. Congress then sought to order the chaos. FLPMA expressly authorizes the exchange of public land for private land so long as the Bureau "determines that the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a). Because the land exchange here complied with FLPMA, the

district court should have denied the Tribes' challenge. It's that simple.

Rather than straightforwardly applying FLPMA, the majority concludes that an apparently defunct 1900 statute overrides Congress's most recent and comprehensive instruction and thus unwinds the land exchange. The majority essentially freezes turn-of-the-20th-century law in place and ignores Congress's will. Never mind that FLPMA explicitly repealed and replaced a 1926 statute that referenced this land—confirming the statute's applicability here. The result is that the plot of Idahoan land must forever remain in the federal government's hands—unless Congress *again* acts to reform public-land laws.

Because FLPMA governs this transaction, I respectfully dissent.

## I.

### Background

Since 1944, Simplot has owned and operated the "Don Plant" near Pocatello, Idaho, on privately owned lands. The Don Plant processes phosphate ore. According to Simplot, the phosphate produced at the plant is crucial to making high-quality fertilizer and supports the country's food supply. But the plant also produces a byproduct, phosphogypsum—also called just "gypsum." Gypsum can't simply be thrown away because of its mineral content, and so the chemical must be stored in an onsite facility called a "gypsum stack" or "gypstack." If gypstacks run out of space, the plant cannot continue to operate. In 2020, Simplot projected that the Don Plant's gypstack would reach capacity by 2031.

The solution?  Simplot sought new land to expand its gypstack capacity.  By 1994, Simplot had proposed a land exchange with the Bureau.  Simplot identified a 713-acre plot of public land next to the Don Plant that was well-suited for gypstack expansion.  The added land would extend the Don Plant's operative life over 50 years—to 2085.

Long ago, this land was part of the Tribes' Fort Hall Reservation, which was created in 1868.  *See* Treaty with the Shoshonees and Bannocks, Art. II, July 3, 1868, 15 Stat. 674 ("Fort Bridger Treaty").  In 1898, the Tribes ceded that portion of their Reservation to the federal government.  *See* Agreement with the Shoshonees and Bannocks, Feb. 5, 1898, Arts. I, IV, 31 Stat. 672, 674 ("1898 Agreement").  The 1898 Agreement granted the Tribes the right to use the land for certain purposes "[s]o long as [the ceded Fort Hall lands] . . . remain part of the public domain."  1898 Agreement, Art. IV, 31 Stat. 674.  The Agreement did not restrict the government's ability to dispose of the land.  *See generally id*.

Congress ratified the 1898 Agreement two years later.  Act of June 6, 1900 ("1900 Act"), ch. 813, § 1, 31 Stat. 672, 675.  Under the 1900 Act, Congress expressly commanded that the ceded land "shall be opened to settlement by the proclamation of the President."  *Id.* at 676.  It then established that "the residue of said ceded lands . . . shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only."  *Id.*  The 1900 Act has other requirements.  It sets the price for the sale of land at "two dollars and fifty cents per acre" of certain "agricultural land" and "one dollar and twenty-five cents per acre" for "grazing lands."  *Id.*  It also limits "purchasers" of the land to no "more than one hundred and sixty acres."  *Id.*

Fast forward to the present day. After years of environmental assessments and litigation, the Bureau approved the swap in its current form in August 2020. Under the agreement, the Bureau would transfer the 713-acres parcel to Simplot, and Simplot would give the government two plots—one 666 acres and another 160 acres—of privately owned land and a cash donation to the Bureau of Indian Affairs or the Tribes directly.

In accepting the land exchange, the Bureau concluded that the exchange would well serve the public interest. For example, the Bureau noted that the exchange would lead to a net *gain* of 113 acres of lands available for exercise of off-reservation tribal treaty rights. The Bureau also noted that the exchange would support about 3,763 jobs—generating around $172.7 million in income—and would contribute nearly $768.3 million a year in industrial activity across the region.

To ensure the exchange was fair, the Bureau relied on a professional third-party appraisal of the land exchange's market value. The appraisal determined that the public land's highest and best use was for "agricultural uses." Though the appraisal acknowledged Simplot's unique plans to use the land to expand its gypstack capabilities, the appraisal didn't factor that use into its market-value calculation.

The Tribes sued to challenge the Bureau's approval of the exchange under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (stating that courts may "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Simplot then intervened. The district court held that FLPMA didn't govern the land exchange and that the 1900 Act barred

the exchange altogether. The district court held also that the exchange violated the procedural requirements of FLPMA and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47. Given the remedial difficulty of unscrambling the egg of an exchange "completed more than two years ago," the district court certified its order for immediate appeal and stayed further proceedings pending our decision. We granted Simplot's petition for permission to appeal and the Bureau's cross-petition.

## II.

### FLPMA Governs the Land Exchange

Under its plain text, FLPMA governs the land exchange between the Bureau and Simplot. It broadly applies to the exchange of *all* "public lands," subject to two narrow exceptions not relevant here. It was thus an error to rule that the land exchange violated the 1900 Act. While the 1900 Act is another way to dispose of the land involved in the exchange, it coexists with FLPMA. It doesn't in any way limit or supplant FLPMA's procedures.

### A.

In 1964, Congress recognized a problem with federal public-land laws. In Congress's view, the then-existing federal public-land laws were "inadequate" to meet the "needs of the American people." Act of Sept. 19, 1964, Pub. L. No. 88-606, § 2, 78 Stat. 982. That's because they "ha[d] developed over a long period of years through a series of Acts of Congress which are not fully correlated with each other[.]" *Id.* Congress found that a "comprehensive review" of the laws was needed. *Id.* So Congress established the "Public Land Law Review Commission" to study the laws and recommend changes to them. *Id.* § 3. The

Commission's goal was to reform the laws for the retention, management, and disposal of public lands "in a manner [that] provide[s] the maximum benefit for the general public." *Id.* § 1.

The result of "more than a decade of studying this problem" was FLPMA. *United States v. Locke*, 471 U.S. 84, 87 (1985). Passed in 1976, FLPMA provides a "comprehensive land-management" framework, *Bolt v. United States*, 944 F.2d 603, 608 (9th Cir. 1991)—establishing "uniform procedures" for the disposal and acquisition of public lands, 43 U.S.C. § 1701(a)(10). In enacting FLPMA, Congress also repealed hundreds of public-land laws. *See* Pub. L. 94-579, 90 Stat. 2743, 2787-91 (October 21, 1976).

FLPMA governs the land exchange for two reasons.

First, FLPMA applies broadly. FLPMA defines "public lands" as "any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership[.]" 43 U.S.C. § 1702(e). So FLPMA governs *all* public lands no matter how the land came into the possession of the federal government—including cession from Indian tribes.

And FLPMA provides for only two narrow exceptions to the meaning of "public lands"—confirming the Act's near universal scope. FLPMA allows one exception for "lands located on the Outer Continental Shelf," *id.* § 1702(e)(1), which are already governed by another statute, the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq. See Parker Drilling Mgmt. Services, Ltd. v. Newton*, 587 U.S. 601, 606 (2019). A second exception exists for "lands held

for the benefit of Indians, Aleuts, and Eskimos," 43 U.S.C. § 1702(e)(2), presumably because those lands cannot easily be disposed of by the federal government.  No other exception applies to the Act's "public lands" definition—meaning that FLPMA applies to all federally owned lands, regardless of whether existing laws govern the land.

Second, FLPMA facilitates the acquisition and disposal of public lands by expressly approving land exchanges.  To begin, the federal government may "acquire" public lands "by . . . exchange" "[n]otwithstanding any other provisions of law."  *Id.* § 1715(a).  Next, "public land . . . may be disposed of by exchange . . . under this Act" when it "well serve[s]" the "public interest."  *Id.* § 1716(a).  In considering the "public interest," the government must "give full consideration to . . . the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife."  *Id.*  FLPMA then mandates that the "values of the lands exchanged" must be "equal, or if they are not equal, the values [must] be equalized by the payment of money."  *Id.* § 1716(b).  In the end, the import of these sections is that the government may exchange land "under this Act" without regard to "other provisions of law."  *See id.* §§ 1715(a), 1716(a).

Given this, FLPMA definitively governs the Bureau's approval of this public-land exchange.  The federal government owns the plot of land exchanged with Simplot and no party disputes that the Bureau manages the land.  *Id.* § 1702(e).  It also makes no difference that the land was once part of the Tribes' reservation because FLPMA applies "without regard to how the United States acquired ownership."  *Id.*  Finally, because the Tribes "cede[d]" the land to "the public domain" over a hundred years ago, 1898

Agreement, Arts. I, IV, 31 Stat. at 672–74, FLPMA's exception for lands held for the "benefit of Indians," 43 U.S.C. § 1702(e)(2), doesn't apply. Thus, so long as the government complied with FLPMA's requirements, the Bureau had authority to dispose of the exchanged land "under th[e] Act." *See id.* § 1716(a).

## B.

Despite FLPMA's plain language, the majority contends that the 1900 Act bars the Bureau from exchanging these lands. Recall that § 5 of the 1900 Act provides that the lands ceded by the Tribes in 1898 "shall be opened to settlement . . . and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only." 31 Stat. at 676. Based on the solitary word "only," the majority argues that the 1900 Act supersedes FLPMA simply because FLPMA doesn't fit into one of the four categories of law permitting the disposal of the ceded Tribal land. Even more, the majority would read the 1900 Act as *permanently* barring any disposal of the ceded Fort Hall lands under current law. That's because "Congress has repealed nearly all the homestead, townsite, stone and timber, and mining laws," and so "the federal government does not currently have a viable method for disposing of the ceded lands." *Shoshone-Bannock Tribes of Fort Hall Reservation v. Daniel-Davis*, No. 4:20-cv-00553-BLW, 2023 WL 2744123, at *4 (D. Idaho 2023). Thus, while FLPMA expressly contains only two exceptions to the definition of "public lands," *see* 43 U.S.C. § 1702(e)(1)–(2), the majority invents a third exception—one for the Tribes' ceded Fort Hall lands.

The majority is wrong for several reasons.

**1.**

First, "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Because FLPMA and the 1900 Act "readily c[an] be seen as supplementing one another," we must give them both full effect. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989). In this case, Congress granted the federal government *two* independent ways to dispose of the land involved in the exchange—the 1900 Act and FLPMA. As complementary grants of authority to dispose of land, the Bureau could follow either.

Through the 1900 Act, Congress provided one way to dispose of the Tribes' ceded territory. Congress devised four paths to dispose of the land under the 1900 Act—through "the homestead, townsite, stone and timber, and mining laws of the United States only." § 5, 31 Stat. at 676. The 1900 Act clearly stated its objective—it "opened" the ceded Fort Hall lands to "settlement." *Id.* Given this language, the word "only" doesn't permanently encumber the land or disable the federal government from disposing of it under other congressional grants of authority. Rather, § 5 should be read as a permission to convey the land to settlers using the 1900 Act's framework. In context then, the word "only" emphasized the federal government's authority to dispose of the land *under the 1900 Act*. But it didn't restrict the federal government's authority to act under future congressional grants of power.

At all times, Congress was free to create new paths for disposal of public lands, including the ceded land. In other

words, nothing in the 1900 Act abrogated the Bureau's ability to use *future* grants of disposal authority under *other types* of statutes. "It would be inappropriate to interpret th[e 1900 Act's] language as being continuously exclusive in nature" in light of later congressional enactments. *See Pub. Serv. Co. of Colo. v. FERC*, 754 F.2d 1555, 1563 (10th Cir. 1985).

Indeed, even before FLPMA, Congress provided other ways to dispose of the Tribes' ceded Fort Hall lands— supporting the view that the 1900 Act is just one independent, but non-exclusive, grant of authority. Just four years after the 1900 Act, Congress removed the public-auction requirement from "all lands of the former Fort Hall Indian Reservation" near Pocatello. Act of Mar. 30, 1904, ch. 854, 33 Stat. 153-154 ("1904 Act"). Twenty years later, Congress authorized the grant of "public lands" to the city of Pocatello. *See* Act of May 12, 1920, 41 Stat. 596–97 (May 12, 1920) ("1920 Act"). Shortly after that, Congress added another category of disposal laws "applicable to the ceded lands on the former Fort Hall Indian Reservations"—auction provisions for isolated tracts of public lands. *See* Act of May 19, 1926, ch. 337, 44 Stat. 566 ("1926 Act"). And then in the 1930s, Congress included yet another category—laws for the "sale of desert lands." Act of May 4, 1932, ch. 164, 47 Stat. 146 ("1932 Act"). As this shows, the term "only" in the 1900 Act wasn't meant to forever preclude other ways to dispose of the ceded Fort Hall lands. And in FLPMA, Congress expressly created the latest path for disposal of all public lands, including the Tribes' ceded land.

So FLPMA and the 1900 Act pose no "irreconcilable" conflict. *See Morton*, 417 U.S. at 550. The 1900 Act offers one way to dispose of the ceded land under its narrow grant of authority and FLPMA offers another way under its

broader grant of authority. Under the 1900 Act, the "only" way to dispose of the land was through the four categories of statutes. Under FLPMA, land can be exchanged if it "well serves" the "public interest." There's no reason to read a conflict between the two. Indeed, "[w]hen there are two acts upon the same subject, the rule is to give effect to both if possible." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939); *see also Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose."). Reading them harmoniously then, we should interpret the 1900 Act and FLPMA as granting supplemental, but independent, authorities to dispose of the public lands involved in the exchange. And so the federal government doesn't violate the 1900 Act when acting under FLPMA's authority.

Think of it this way. In 1900, Congress gave the federal government the statutory equivalent of a Ford Model T. At the time, Congress made clear that the Model T was the *only* car the federal government could use. To dispose of ceded Fort Hall lands then, the federal government had to drive the Model T—even though it was slow and its parts fell into disrepair over time. But in 1976, Congress bought the federal government a new car—this time a sleek Mustang. The Mustang is, of course, much faster and more efficient than the Model T. So while the Model T may still sit in the garage, nothing prevents the government from taking the new Mustang for a spin. Here, the federal government drove the legislative Mustang—FLPMA.

**2.**

Second, rather than apply the plain meaning of both statutes, the majority manufactures a clash between the two—contrary to the rules of statutory interpretation. By

fixating on the word "only," the majority treats the 1900 Act as an enduring bar on the federal government's ability to dispose of the ceded land—even after FLPMA. In other words, the majority views the 1900 Act and FLPMA as overlapping *restrictions* on the federal government, requiring the Bureau to comply with *both* to exchange the land.

But that reading conflicts with the plain meaning of FLPMA. It would be surprising if Congress meant to frustrate its own authority to facilitate future land exchanges of the ceded land through a lone adverb in a 125-year-old statute. Compare this to other congressional statutes that *did* seek to bind future Congresses. *See* Religious Freedom Restoration Act, 42 USCA § 2000bb-3 ("Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter."); Freedom of Information Act, 5 U.S.C. § 552(b)(3)(B) ("This section does not apply to matters that are . . . specifically exempted from disclosure . . . if that statute . . . specifically cites to this paragraph."). Indeed, given that both statutes were enacted to open the public lands, rather than conceiving of the two laws as overlapping restraints on the government, the better reading is to view them as complementary grants of authority *empowering* the federal government to dispose of the land. Again, the federal government can drive either the Model T or the Mustang—it needn't drive *both* at once.

Not to mention that it would raise significant constitutional questions for this court, through a clear statement requirement, to argue that the 1900 Congress barred the 1976 Congress from fully exercising its legislative power. *See Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("[S]tatutes enacted by one Congress cannot bind a

later Congress."); *Ctr. for Investigative Reporting v. U.S. Dep't of Justice*, 14 F.4th 916, 942 (9th Cir. 2021) (Bumatay, J., dissenting) ("Express-statement laws are a form of entrenchment: they require a later-enacted law to expressly refer to the prior law if it is to actually supersede that law."). So we should avoid applying "a canon of 'constitutional collision'" to the 1900 Act. *United States v. Hansen*, 599 U.S. 762, 781 (2023) (simplified). It's better to read the two statutes as harmoniously conferring separate and independent grants of authority on the federal government.

**3.**

Third, the majority invokes the specific-governs-the-general canon to argue that the 1900 Act trumps FLPMA. But the canon isn't applicable. Under the canon, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 663 (2007) (simplified). The specific/general distinction is, however, beside the point. FLPMA doesn't "submerge" the 1900 Act—both statutes *coexist* as independent grants of disposal authority. *See Argentine Republic*, 488 U.S. at 438; *see also United States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1101 (9th Cir. 2000) (reading "two enactments by Congress over thirty-five years apart" to allow them to "most comfortably coexist, giving each enacting Congress's legislation the greatest continuing effect").

Indeed, the canon's most common application occurs when there's "a general prohibition that is contradicted by a specific permission, or a general permission that is contradicted by a specific prohibition." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal*

*Texts* 167 (2012); *see also Wood v. United States*, 41 U.S. 342, 365 (1842) (holding that the "more natural, if not the necessary, inference" is that two later-enacted, specific statutes on revenue collection are simply "auxiliary to . . . the old[er, far more general] law [on revenue collection], even when" the laws overlap).  Here, we don't have either situation; instead, we have a "specific permission" (the 1900 Act) followed by a "general permission" (FLPMA).  So we have coexistence—not conflict.  Rather than pit the statutes against each other, we should read them as providing two self-contained grants of disposal authority.  So the Bureau can follow either the 1900 Act procedures or FLPMA's procedures.

And besides, FLPMA *does* address the Fort Hall lands, and so the specific-governs-the-general canon wouldn't apply.  Even if we were to read the 1900 Act as a specific restriction (as the Tribes argue), FLPMA *specifically* targets the Fort Hall lands, and so there's no conflict between the specific and the general.  Instead, we have two provisions that specifically address the land.

Recall that FLPMA identified and repealed 12 categories of disposal laws to make space for its uniform disposal and planning procedures.  *See* §§ 702, 703(a), 705(a)(2), 90 Stat. 2787-2791, 2793; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 877 (1990) ("FLPMA . . . repealed many of the miscellaneous laws governing disposal of public land . . . and established a policy in favor of retaining public lands for multiple use management.").  It turns out that the 1926 Act was one of these statutes.  § 703(a)(6), 90 Stat. 2790.  And as mentioned earlier, the 1926 Act's *only* effect was to "[e]xtend[]" isolated tract disposal authority "to ceded lands of the Fort Hall Indian Reservation."  Act of May 19, 1926,

ch. 337, 44 Stat. 566.  It would blinker reality to deny that this repeal specifically references the ceded Fort Hall lands.

As a result, the specific-governs-the-general canon simply can't apply here.  How could it?  Underlying that canon is the assumption that, between a specific and a general provision, the specific provision "comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence."  *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016) (quoting Scalia & Garner, *Reading Law* 183).  That assumption is unwarranted where FLPMA's repeal of the 1926 Act shows "the mind of the legislator [was] turned to the details" of the Fort Hall lands.  *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (simplified).  True, whether a statute's chosen rule is couched in general or narrow language can be a helpful proxy for figuring out which problems Congress addressed through its legislation.  But proxies aren't perfect.  *See Perez-Guzman*, 835 F.3d at 1075 (noting that it is "[s]ometimes . . . difficult to determine whether a provision is a general or a specific one") (quoting Scalia & Garner, *Reading Law* 187).  Since Congress confronted "the particularized problems" of the disposal of the ceded Fort Hall lands when it repealed the 1926 Act in FLPMA, *Radzanower*, 426 U.S. at 153, it follows that Congress has expressed its "clear intention" that FLPMA's uniform disposal procedures apply to those lands too, *Morton*, 417 U.S. at 550.  In other words, the Fort Hall lands couldn't be a specific case that escaped Congress's attention when it enacted FLPMA, because FLPMA explicitly repealed the 1926 Act—a statute that *exclusively* regulates the Fort Hall lands.

FLPMA and the 1900 Act's common design to open and distribute federal land distinguishes this case from the cases

applying the specific/general canon cited by the majority. Take *Radzanower*. That case involved the conflict of two dissimilar statutes—one "focused on the narrow, 'particularized problem[]' of determining venue in suits against national banks" and the other "focused broadly on the 'objective of promoting fair dealing in the securities markets.'" Maj. Op. at 24 (quoting *Radzanower*, 426 U.S. at 153–54). Likewise, *National Association of Home Builders* dealt with a conflict between two statutes addressing distinct problems: the Clean Water Act, which establishes a system "designed to prevent harmful discharges into the Nation's waters," and the Endangered Species Act, which is "intended to protect and conserve endangered and threatened species and their habitats." 551 U.S. at 650–51. Unlike in those cases, Congress here confronted the specific issue of disposal authority over the ceded Fort Hall lands when drafting both the 1900 Act and FLPMA. *See* § 703(a)(6), 90 Stat. at 2790.

In sum, FLPMA's text and structure show that Congress understood its disposal procedures to apply to "the very problem posed by the case at hand"—the ceded Fort Hall lands. *See Perez-Guzman*, 835 F.3d at 1075.

**4.**

Fourth, the majority focuses heavily on FLPMA's uncodified provision establishing that "[n]othing in this Act shall be deemed to repeal any existing law by implication." § 701(f), 90 Stat. at 2786. Given that FLPMA expressly repealed hundreds of laws but not the 1900 Act, the majority believes that Congress purposefully excluded the Fort Hall lands from FLPMA's land disposal mechanism. But this argument falls flat.

For one, as stated above, FLPMA *does* specifically address the ceded Fort Hall lands by repealing the 1926 Act. *See* § 703(a)(6), 90 Stat. 2790. So this argument cuts the other way. We can't ignore that Congress specifically intended FLPMA to govern the ceded Fort Hall lands when it repealed the 1926 Act, which governed *only* those lands. So FLPMA's repeal of the 1926 Act settles that Congress contemplated the Fort Hall lands, along with so many other federal lands, to be subject to FLPMA's disposal procedures.

And more to the point, there's no "clear repugnancy" between the two statutes requiring a choice between one or the other. *Georgia v. Pa. R. Co.*, 324 U.S. 439, 456–57 (1945) ("Only a clear repugnancy between the old . . . and the new [law] results in the former giving way"). Thus, Congress didn't need to expressly repeal the 1900 Act. Nor does giving FLPMA full effect implicitly repeal the 1900 Act. To return to the automobile analogy, Congress's giving the Bureau the keys to the Mustang didn't take away the keys to the Model T. The Model T remains in the garage—even if it's broken down.

Even so, the majority would require Congress to expressly repeal the 1900 Act for FLPMA to apply to the Tribes' ceded Fort Hall lands. Such a reading eviscerates the plain meaning of FLPMA. Rather than follow statutory text, the majority would have us consult the patchwork of public-land laws that FLPMA expressly tried to reform. And in the majority's telling, if an arcane law happens to have escaped Congress's notice, then that law serves as a living fossil that supersedes FLPMA's plain text. But "unawareness" of obscure public law statutes is not new. *See Wilderness Soc. v. Morton*, 479 F.2d 842, 881 (D.C. Cir. 1973). Legislation is not the esoteric exercise of cataloguing arcane statutes. Congressmen are not archivists. Rather, legislation is about

making rules that govern our nation.  And through FLPMA, Congress placed those fossils in a museum—to look and wonder at—but not to govern modern life.  And requiring Congress to explicitly reference the 1900 Act to give FLPMA full effect is merely a "magical password[]" requirement, which has been soundly rejected.  *Dorsey*, 567 U.S. at 274 (quoting *Marcello v. Bonds*, 349 U.S. 302, 310 (1955)).

### 5.

Fifth, because the plain meaning offers little support, the majority relies on legislative purpose.  The majority argues that repealing the 1926 Act, but not the 1900 Act, "is consistent with FLPMA's overarching purpose."  Maj. Op. at 22.  According to the majority, FLPMA enshrines a federal policy that "the public lands be retained in Federal ownership."  *Id.* (emphasis omitted) (quoting 43 U.S.C. § 1701(a)(1)).  But the majority ignores the rest of § 1701(a)(1), which expressly encourages the disposal of public land if the "disposal of a particular parcel will serve the national interest."  43 U.S.C. § 1701(a)(1)).  Indeed, according to another circuit, FLPMA just "embodie[d] a congressional intent to centralize and systematize the management of public lands."  *Sierra Club v. Hodel*, 848 F.2d 1068, 1082 (10th Cir. 1988); *see* 43 U.S.C. § 1701(a)(10) (announcing a congressional policy that "uniform procedures for any disposal of public land … be established by statute").

This proves the "dangers in using supposed purpose rather than statutory text to interpret the law."  *Mi Familia Vota v. Fontes*, 129 F.4th 691, 744 (9th Cir. 2025) (Bumatay, J., dissenting).  The Supreme Court has "emphasized many times [that] what Congress (possibly) expected matters

much less than what it (certainly) enacted." *Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2067 (2025) (simplified). Thus, it is "quite mistaken to assume ... that any interpretation of a law that does more to advance a statute's putative goal must be the law." *Id.* (simplified). It is even more so the case when Congress had multiple, sometimes competing purposes.

So the bottom line is that it strains credulity to read FLPMA as accomplishing federal retention of the Fort Hall lands *only* by repealing the 1926 Act—and not through its uniform disposal procedures—while acknowledging that FLPMA simultaneously accomplishes the same policy for most other federal land *through* those uniform procedures. Congress simply did not make an idiosyncratic, plot-specific judgment about the procedures applicable to the ceded Fort Hall lands. Instead, FLPMA's repeal of the 1926 Act cleared the way for its uniform procedures to apply to the ceded Fort Hall lands, along with all the other lands governed by the many statutes FLPMA repealed. *See* 43 U.S.C. § 1701(a)(10).

## 6.

Next, the Indian canon is no help here. Under the Indian canon of construction, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). But before jumping to the canon, two requirements must be met. *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir. 2003).

To begin, there must be ambiguity in the statute. "The canon of construction . . . does not permit reliance on ambiguities that do not exist; nor does it permit disregard of

the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc*., 476 U.S. 498, 506 (1986); *see also Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774 (1985) ("[E]ven though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." (simplified)).

Next, the statute must be "passed for the benefit of dependent Indian tribes." *Negonsott v. Samuels*, 507 U.S. 99, 110 (1993) (simplified); *see also Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 729 ("[T]he presumption applies only to federal statutes that are 'passed for the benefit of dependent Indian tribes.'" (simplified)).

The district court applied the Indian canon to the 1900 Act even though it expressly found that "the 1900 Act is not ambiguous." *Shoshone-Bannock Tribes*, 2023 WL 2744123, at *5 n.3. That concession immediately takes this out of the canon's scope. Further, even if there were ambiguity, the land-disposal provision of the 1900 Act was not passed for the benefit of the Tribes. Section 5 was no codification of the Fort Bridger Treaty or the 1898 Agreement. While the Tribes maintained use rights over the ceded Fort Hall lands as long as the land remained in the federal government's hands, neither the Fort Bridger Treaty nor the 1898 Agreement provided the Tribes with a say on how the public lands would be disposed of or conveyed to settlers once the cession was complete. Rather, the 1900 Act went further than the federal government's agreements with the Tribes to set up mechanisms for the disposal of the ceded land, which did not benefit the Tribes. This also takes the case out of the canon's scope. After all, the canon's most "basic idea" is that "ambiguous treaty provisions should be construed

against the drafting party." *Arizona v. Navajo Nation*, 599 U.S. 555, 572 (2023) (Thomas, J., concurring). That's not an issue here.

Perhaps conceding the 1900 Act's clarity, the majority tries a different take. Instead of an interpretive canon to help make sense of semantic ambiguity, the majority turns it into a "clear statement canon." Maj. Op. at 30. It is true that "Congress . . . must clearly express its intent to" "abrogate Indian treaty rights[.]" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). But the majority's invocation of this "clear statement canon" is wrong for two reasons. First, the "clear statement canon" *only* applies to abrogation of "Indian treaty rights." *Cf. id.* at 202–03 (examining conflict between 1837 Treaty with the Chippewa and Minnesota's enabling Act). And neither the 1900 Act nor FLPMA abrogate the Tribes' treaty rights. As just stated, the 1898 Agreement grants the Tribes' use rights "[s]o long as any of the [ceded Fort Hall lands] remain part of the public domain[.]" Art. IV, 31 Stat. at 674. By its express terms, any treaty rights terminate when the ceded Fort Hall lands leave the "public domain." And nothing in the 1898 Agreement gives the Tribes the right to determine whether the ceded Fort Hall lands remain in the "public domain." So disposing of the ceded Fort Hall lands under either the 1900 Act or FLPMA doesn't violate any treaty right and the "clear statement canon" doesn't apply.

Second, the majority all but concedes that this case has nothing to do with abrogation of treaty rights. Instead, the majority admits that the only "ambiguity" here is "whether FLPMA repeals or supersedes the 1900 Act's restrictions on disposal." Maj. Op. at 30. So the only conflict here—and by now this should come as no surprise—is between the 1900 Act and FLPMA. That question doesn't implicate the

"clear statement canon."  Indeed, the majority's use of the "clear statement canon" proves too much.  If Congress needed to provide any more of a "clear indication" of "intent to abrogate the Tribes' usufructuary rights," Maj. Op. at 33, than its explicit reference to the 1926 Act in FLPMA, then Congress's enactment of the 1904 Act, 1920 Act, 1926 Act, and 1932 Act, as well as the repeal of the 1926 Act in FLPMA, would all be invalidated based on the failure to give a "clear statement."

For the same reasons, the argument that the land exchange breached the United States' trust responsibility to the Tribes fails.  As the Tribes acknowledge, to establish a breach of trust, an Indian tribe "must establish, among other things, that the text of a treaty, statute, or regulation imposed certain duties on the United States."  *Navajo Nation*, 599 U.S. at 563.  "[U]nless there is a specific duty that has been placed on the government with respect to Indians, the government's general trust obligation is discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (simplified).  As discussed, Section 5 of the 1900 Act doesn't grant the Tribes any rights regarding the disposal of the ceded Fort Hall lands.  And so, the federal government complies with its trust obligations by following FLPMA—a generally applicable law.

## 7.

Finally, the majority downplays our precedent.  Almost forty years ago, we encountered a nearly identical situation to this case.  *See Blackfeet Indian Tribe v. Mont. Power Co.*, 838 F.2d 1055 (9th Cir. 1988).  There, we sensibly read two statutes with seemingly contradictory requirements as

"coexisting" and gave the parties the "choice" between the two. *Id.* at 1058, 1059. In that case, Congress enacted two statutes governing rights-of-way over tribal lands—one in 1904 and one in 1948. *See id.* at 1056–57. The 1904 Act was "specific"—it authorized rights-of-way "for oil and gas pipelines" for up to 20 years. *Id.* at 1058 (citing 25 U.S.C. § 321). The later Act of 1948 was "more general"—it authorized rights-of-way "for *all* purposes" without any statutory time limit. *Id.* (quoting 25 U.S.C. § 323). By regulation, these rights-of-way could extend up to 50 years. *Id.* at 1057. What's more, the Act of 1948 expressly didn't repeal "any existing statutory authority empowering the Secretary of the Interior to grant rights-of-way over Indian lands." *Id.* (citing 25 U.S.C. § 326). Very familiar.

The Secretary of the Interior then granted a power company five 50-year natural-gas rights-of-way over Blackfeet tribal lands. *Id.* at 1055–56. The tribe sued, claiming that the rights-of-way could not last more than 20 years under the 1904 Act. *Id.* We then had to confront the "essential question"—"whether the 1904 Act, the 1948 Act, or both, control[led] the five rights-of-way." *Id.* at 1057. The tribe argued that the 1904 Act—as the more specific statute governing natural gas—should control. *Id.* at 1056. And we noted that any legal ambiguity should be resolved in favor of the tribe under the Indian canon of construction. *Id.* at 1058. Again, this should sound familiar.

Still, we interpreted the laws "with an eye toward upholding both statutes." *Id.* We observed that the later 1948 law was meant to "broaden" the federal government's powers to grant rights-of-way and to "satisfy the need for simplification and uniformity in the administration of Indian law." *Id.* (simplified). The two laws then "c[ould] be read as coexisting." *Id.* Given that "both [laws] should be

applied. . . .[,] the term of years for the rights-of-way can be either 20 or 50 years." *Id.* at 1059. Thus, the parties in the case had a "choice" between the two time limits and, because the tribe had agreed to the 50-year term, the 1948 law governed. *Id.* In other words, the statutes were overlapping, independent grants to the government—empowering the Secretary to authorize rights-of-way under either law.

*Blackfeet Indian Tribe*'s parallels to this case are obvious. Both the 1900 Act and the 1904 Act granted the Secretary of Interior limited authority over a narrow subject matter—the authority to dispose of ceded Fort Hall lands and authority to grant rights-of-way for oil and gas pipelines, respectively. Both acts were followed by comprehensive statutory reforms to modernize and simplify complex areas of law. Both FLPMA and the Act of 1948 vested *broader* powers in the Secretary over *broader* subject matters. And both FLPMA and the 1948 Act did not purport to impliedly repeal the earlier statutes. And given that both statutes implicated tribal lands, the Indian canon was invoked. We should thus treat this case as we did *Blackfeet Indian Tribe*—both the 1900 Act and FLPMA "coexist" and serve as independent vehicles to dispose of the public lands in the land exchange. *See id.* at 1058.

*     *     *

Under the plain text of FLPMA, the canons of statutory interpretation, the history of the ceded land, the context of public-land laws, and our precedent, FLPMA should govern the land exchange. It was mistaken to conclude that a relic from the turn of the last century supersedes all this.

## III.

### The Land Exchange Complies with FLPMA and NEPA

Aside from invalidating the land exchange for violating the 1900 Act, the district court also sought to unwind the land exchange (1) for violating FLPMA's market valuation regulations, (2) for failing to expressly incorporate the Bureau's findings on "cultural resources" into its record of decision, and (3) for violating NEPA. None warrant setting aside the land exchange.

### A.

Under FLPMA, "[t]he values of . . . lands exchanged" by the Bureau and the other party "shall be equal . . . [or] equalized by the payment of money[.]" 43 U.S.C. § 1716(b). To ensure that lands in an exchange are close enough in value, the Bureau must "arrange for [an] appraisal," *id.* § 1716(d)(1), to determine the exchanged lands' "market value," 43 C.F.R. §§ 2200.0-5(c), 2200.0-6(c). The appraiser here determined that the highest and best use for the exchanged land was for "agricultural and recreational uses, wildlife habitat, [or] watershed," even though the appraiser recognized that the land had unique "appeal" to Simplot for "expansion" of its gypstack facility. The district court ruled the appraisal insufficient because it believed that Simplot's plan to use the exchanged land for gypstack expansion should drive "market value." But because a one-off land-use plan by a unique market participant doesn't reflect "market value," the district court's decision was wrong.

"Market value" refers to the lands' value "in a competitive and open market." *Id.* § 2200.0-5(n). To calculate "market value," the appraiser must first

"[d]etermine the highest and best use of the property." *Id.* § 2201.3-2(a)(1). And under FLPMA's regulations, the appraisal must, "to the extent appropriate," follow the Department of Justice's Uniform Appraisal Standards for Federal Land Acquisitions ("Appraisal Standards"). *Id.* § 2201.3. The Appraisal Standards, in turn, provide that "there must be demonstrated an actual profitable use or a market demand" for a use to qualify as a highest and best use. Appraisal Standards § 4.3.2.2, at 104; *see id.* § 4.3.2.1, at 103. That highest and best use becomes the basis to "[e]stimate the value of the lands . . . as if . . . available for sale in the open market." 43 C.F.R. § 2201.3-2(a)(2).

But "market value does not include the special value of property to the owner arising from its adaptability to his particular use." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979). On the contrary, only the "general demand" that gives property "value transferrable from one owner to another" can be considered. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949). The Appraisal Standards adopted this rationale when it comes to a unique demand:

> [V]alues resulting from the urgency or uniqueness of the government's need for the property or from the uniqueness of the use to which the property will be put do not reflect what a willing buyer would pay to a willing seller . . . . [G]overnment projects may render property valuable for a unique purpose. Value for such a purpose, if considered, would cause "the market to be an unfair

> indication of value," because there is no market apart from the government's demand.

Appraisal Standards § 4.3.2.2, at 104 (quoting *United States v. Weyerhaeuser Co*., 538 F.2d 1363, 1366, 1367 (9th Cir. 1976)) (simplified). While this refers to the federal government's unique demand, the same principle applies to nonfederal parties too. "[N]either an existing federal use nor a nonfederal party's proposed use can be considered [in the highest and best use analysis] unless there is competitive demand for that use in the private market." *Id.* § 4.10, at 186.

As stated earlier, location is key to market value. The appraiser correctly refused to treat Simplot's unique plan to use the land for gypstack expansion to set market value. That's because, as the district court acknowledged, "[t]here is not a generalized demand for gypstacks," and "a gypstack is only valuable to Simplot." *Shoshone-Bannock Tribes*, 2023 WL 2744123, at *10. In other words, the location is only valuable to Simplot. For others, the record shows that the location was exceedingly difficult to access legally, had steep topography, and lacked utilities.

The Tribes gesture to two waste disposal sites that they claim are "in the region" of the Don Plant to suggest there's a market for industrial waste sites on the exchanged land. But the Tribes ignore that the two waste sites appear to be about 274 miles apart. Even more to the point, *established* waste sites—unlike *competing proposals*—don't constitute a competitive market to build a new waste site. *See* Appraisal Standards § 4.10, at 186 (barring consideration of a "nonfederal party's proposed use" if there is no "competitive demand for that use in the private market").

Finally, the district court asserted that "the fact that the land here is uniquely valuable to Simplot must be considered in the appraisal because it profoundly affects the most basic underpinnings of market value: supply and demand." *Shoshone-Bannock Tribes*, 2023 WL 2744123, at \*10. But this view is economically unsound and violates the emphasis on competitive demand incorporated into the Appraisal Standards. No Ph.D. in economics is necessary to understand that "supply and demand" favor the appraiser's view of the land as agricultural, wildlife, or recreational use. The land is abundant. And only one market participant values the land highly. Imagine the land was worth $10/acre to ten buyers and $100/acre to a single buyer. If the seller put the land up for auction, the ten buyers would each bid no more than $10/acre—the ceiling of their demand. The single buyer would then win the auction by simply bidding $10.01. That's because auctions only require beating the other bids. So even with one eccentric buyer, the market price would still coalesce around the value to the other market participants. One-off plans have no place in the highest and best use analysis. Plain and simple.

So, in short, the Bureau did not err by relying on an appraisal that refused to consider Simplot's gypstack plans.

### B.

Next, under FLPMA's regulations, in evaluating whether the "public interest" will be "well served," 43 U.S.C. § 1716(a), the Bureau must give "full consideration" to the exchange's impact on "cultural resources." 43 C.F.R. § 2200.0-6(b). The district court faulted the Bureau for failing to analyze the "cultural resources" factor in its record of decision. But the record of decision expressly incorporated the Bureau's environmental impact statement,

which the district court recognized properly engaged in the "cultural resources" evaluation. Thus, there's no basis to set aside the land exchange when the combined record of decision and environmental impact statement gave "full consideration" to all necessary factors.

Neither the Tribes nor the district court point to a statute or regulation requiring the Bureau to articulate its full public-interest analysis in a single document—rather than incorporating some analysis by reference. Indeed, we've expressly *endorsed* the incorporation of analysis across documents in other FLPMA cases. Take *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058, 1063 (9th Cir. 2010). In that case, in reviewing the Bureau's public-interest analysis, the district court looked "only to the Record of Decision" to hold that the analysis glossed over certain factors. *Id.* at 1063. We reversed the district court's determination. *Id.* at 1069. We concluded that the district court was improperly "constrained by its decision to review only the Record of Decision." *Id.* Instead, the final agency action "incorporate[d] the [environmental impact statement]" and we consulted both. *Id.* And after reviewing the "material not considered by the district court" in the environmental impact statement, we were convinced that the Bureau gave "full consideration" of the "public interest." *Id.* In other words, FLPMA has no "cut-and-paste" requirement.

Likewise, the Bureau's record of decision here expressly stated that it was "based on the consideration of the information from the Final [Environmental Impact Statement]." And the district court acknowledged that the environmental impact statement "considered and fully disclosed the impacts of the proposed project on cultural resources." *Shoshone-Bannock Tribes*, 2023 WL 2744123,

at \*16.  Thus, that the "cultural resources" analysis was spread among two documents doesn't constitute a FLPMA violation.  *See Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) ("[A] reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (simplified)).

And FLPMA proceedings are subject to harmless-error analysis.  *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 764–65 (9th Cir. 1986); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").  An agency's error is "harmless" when "its 'mistake . . . is one that clearly had no bearing on the procedure used or the substance of decision reached.'"  *Sagebrush Rebellion*, 790 F.2d at 764–65 (simplified).  The plaintiff bears the burden of proving that an error was prejudicial.  *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 41 (9th Cir. 2025).  Because the Bureau undertook the "full consideration" of the "cultural resources" factors as required by FLPMA, any error was ultimately harmless.

## C.

Finally, NEPA doesn't "demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989).  Instead, "NEPA requires agencies to evaluate the direct and indirect effects of the proposed action."  *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020).  Sometimes that task is challenging.  But the federal government doesn't need to "peer into a crystal ball," "engage in speculative analysis," or "do the impractical, if not enough information is available to permit meaningful consideration."  *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 995 (9th Cir. 2023)

(simplified). So all NEPA requires is the government to "engage in reasonable forecasting." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (simplified). The federal government doesn't need to explain its analysis *beyond* what is reasonably foreseeable. For example, the Supreme Court has approved NEPA analysis that discusses mitigation steps that are "merely conceptual," which "will be made more specific as part of the design and implementation stages of the planning process." *Robertson,* 490 U.S. at 339 (simplified).

Additionally, the Supreme Court has recently reaffirmed the narrow scope of judicial review of an environmental impact statement under NEPA. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 145 S. Ct. 1497, 1515 (2025). That's because "the adequacy of an [environmental impact statement] is relevant only to the question of whether an agency's final decision . . . was reasonably explained." *Id.* at 1511. And when an agency "assess[es, *inter alia*,] . . . feasible alternatives for purposes of NEPA," it "invariably make[s] a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 1513. Thus, the Supreme Court has forcefully reminded us to "afford substantial deference and not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* Indeed—even if an environmental impact statement *does* "fall[] short in some respects, that deficiency may not necessarily require" vacatur of the agency's approval of a project, "at least absent reason to believe that the agency might disapprove the

project if it added more to the" environmental impact statement. *Id.* at 1514. Deference is our marching order.

Although the district court denied most of the Tribes' NEPA claims, it ruled that the Bureau flouted NEPA on the narrow ground that it didn't specifically analyze Simplot's design options for its cooling ponds and expanded gypstacks. True, the Bureau explained in its record of decision that it didn't consider "specific design options" for those proposed actions because they "would be finalized during design and permitting and are subject to change based on technical changes, final engineering, Don Plant production, and other factors." But this determination falls within the "broad zone of reasonableness" permitted by NEPA given that the plans were uncertain. *Id.* at 1513. Moreover, nothing shows that the Bureau would have "disapproved the project if it added more to the" environmental impact statement here. *Id.* at 1514. And that's all that NEPA requires—a good-faith, hard look at the proposals. *See N. Plains Res. Council, Inc.*, 668 F.3d at 1079. Anything more would be speculative, and our court would exceed the proper scope of review by inserting itself further into the Bureau's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth" of the environmental impact statement. *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1513.

The Tribes emphasize that the Bureau glossed over Simplot's "*existing* preliminary design plans and locations." But that misses the point—the fact that *a* plan exists doesn't resolve the uncertainty surrounding which specific design details *will ultimately be selected*. Again, the Bureau need only engage in reasonably forecasting—not crystal-ball reading. *See id.*

The Bureau also noted that final "design details" would have to comply "with other Federal and State requirements"—further mitigating their effects. The Tribes contend that this improperly assumes the effective enforcement of environmental laws by federal and state agencies. But under the presumption of regularity, courts presume that agencies carry out their allotted functions "[i]n the absence of clear evidence to the contrary[.]" *Angov v. Lynch*, 788 F.3d 893, 905 (9th Cir. 2015) (simplified). Simplot is already subject to remedial orders from prior litigation and is required to obtain approvals from multiple federal and state environmental regulators before it begins its project. Simplot has worked effectively with these regulators for decades. With no compelling evidence to the contrary, the Bureau appropriately assumed that these regulators would properly enforce the law going forward.

Thus, the Bureau properly followed NEPA.

## IV.

FLPMA directly authorized the challenged exchange. And the Bureau didn't otherwise violate FLPMA or NEPA. For these reasons, I respectfully dissent.